CALIFORNIA ASSOCIATION OF RURAL HEALTH CLINICS and Avenal Community Health Center, Plaintiffs,

v.

David MAXWELL–JOLLY, Director of California Department of Health Services; Toby Douglas, Chief Deputy Director for Health Care Programs of the California Department of Health Care Services; and the California Department of Health Care Services, Defendants.

No. CIV. S–10–759 FDC/EFB.

United States District Court, E.D. California.

Oct. 18, 2010.

Asha Kaur Jennings, Kathryn Ellen Doi, Murphy Austin Adams & Schoenfeld, LLC, Sacramento, CA, for Plaintiffs.

Kara Kathleen Read–Spangler, Attorney General's Office for the State of California, Sacramento, CA, for Defendants.

*MEMORANDUM AND ORDER*

FRANK C. DAMRELL, JR., District Judge.

This matter is before the court on plaintiffs California Association of Rural Health Clinics ("CARHC") and Avenal Community Health Center ("ACHC") (collectively, "plaintiffs") motion for summary judgment. The parties agree this case presents purely legal questions involving the federal Medicaid law definitions of mandatory Rural Health Clinic ("RHC") and Federally–Qualified Health Center ("FQHC") services benefits, and thus, res-olution of the case via plaintiffs' motion for summary judgment is appropriate.[1]

Plaintiffs contend Congress defined both Medicare and Medicaid RHC and FQHC services benefits to include the Medicare core service[2] identified in 42 U.S.C. § 1395x(aa)(1), which plaintiffs assert requires both programs to reimburse RHCs and FQHCs for the services of medical doctors, dentists, and subject to certain limitations, the services of optometrists, podiatrists and chiropractors. California's Medicaid program, Medi–Cal, formerly reimbursed RHCs and FQHCs for adult dental, chiropractic, optometric and podiatric services. However, on February 19, 2009, the California legislature adopted California Welfare & Institutions Code § 14131.10 ("§ 14131.10") which ended coverage of certain Medicaid benefits to the extent they are "optional" under federal law, including, among others not relevant here, adult dental, podiatry, optometry, and chiropractic services, beginning July 1, 2009.

Since that date, defendant California Department of Health Care Services ("DHCS"), the state agency that administers the Medi–Cal program, has discontinued reimbursement to RHCs and FQHCs for most of these services provided to Medi–Cal beneficiaries. In opposing the motion, defendants describe that they recently reinstated reimbursement for optometry services provided by RHC/

---

1. Defendants filed various objections to plaintiffs' evidence submitted on the motion (Docket # 19). However, the parties agree the issues presented by plaintiffs' motion are wholly legal issues. Plaintiffs' proffered evidence provides simply context to the issues and any disputed facts created by the evidence are not material to resolution of the motion. Therefore, the court overrules defendants' objections directed at the various declarations submitted by plaintiffs in support of the motion.

2. The term "core" services is not used in the statutory scheme at issue here; however, the parties use the term in their papers to reference those services they contend are mandatory services for which RHCs and FQHCs are required to be reimbursed under Medicaid Act. Accordingly, the court likewise uses the term in the same respect herein.

FQHCs, having determined that the Medicaid Act requires payment for optometry services, even if not included in the State Medicaid Plan ("State Plan"), *if* the State Plan had previously provided these services (42 U.S.C. § 1396d(e)). Defendants indicate reimbursement will be retroactive to July 1, 2009. Thus, at issue on the motion is only § 14131.10's exclusion of coverage of adult dental, podiatry and chiropractic services.

By this action, plaintiffs, an association of RHCs (plaintiff CARHC) an a FQHC (plaintiff ACHC), seek declaratory and injunctive relief to stop the continued implementation of § 14131.10 in a manner that they allege conflicts with the federal statutory mandates to reimburse RHCs and FQHCs for providing the subject adult dental, podiatry and chiropractic services. Plaintiffs contend that under the Supremacy Clause, applicable federal law preempts any State law excluding these mandatory services benefits from coverage. Additionally, plaintiffs contend that defendants have violated federal law because DHCS has not received federal approval of its proposed changes to the State Plan reflected in § 14131.10, discontinuing reimbursement of RHCs and FQHCs for these core services.

Defendants oppose the motion, arguing preliminarily that plaintiffs' motion should be denied because a private right of action does not exist to bring either of plaintiffs' claims. Alternatively, defendants request a stay of the action. Should the court reach the merits of the action, defendants argue the at—issue services are optional benefits which are not statutorily mandatory services for which RHCs and FQHCs are required to be reimbursed. Accordingly, the state law's exclusion of coverage for these services is permissible, and thus, there is no conflict with federal law. Defendants further contend that federal law does not require that they receive prior federal approval before implementation of any changes to the State Plan.

The court heard oral argument on the motion on October 8, 2010. By this order, it now renders its decision, GRANTING in part and DENYING in part plaintiffs' motion. The court finds that plaintiffs have a right under federal law to bring both of their claims, and there is no basis to stay the action. As for the merits, the courts finds that plaintiffs have not demonstrated § 14131.10 conflicts with federal law as the subject benefits are not mandatory services under federal Medicaid law required to be reimbursed to RHCs and FQHCs. However, federal law does require prior federal approval of changes to the State Plan at issue here, and thus, plaintiffs are entitled to a declaration finding as such as well as an injunction precluding further enforcement of § 14131.10 with respect to the subject benefits until the State's plan amendment is approved.

## BACKGROUND [3]

### 1. *General Factual Background*

Plaintiff CARHC is a California non-profit corporation, whose mission is to provide education and advocacy regarding the role of California's RHCs in the rural

---

**3.** In some limited respects, defendants dispute the facts as proffered by plaintiffs in their statement of undisputed facts. However, to the extent there is a dispute of fact, the court does not find it material to the legal issues presented by the motion, and thus, it treats the relevant fact as undisputed. Unless otherwise noted, the court finds the facts as described below undisputed.

health care delivery system in order to further the interests of RHCs and their patients. (Defs.' Resp. to Pls.' Stmt. of Undisp. Facts ["RUF"], filed Sept. 22, 2010, ¶ 6.) CARHC currently includes in its membership 65 health care providers each of which is certified by the United States Department of Health & Human Services' Center for Medicare and Medicaid Services ("CMS") as a RHC, as defined for purposes of the Medicaid Program in 42 U.S.C. § 1396d($l$)(1). (RUF ¶ 7.) RHCs operate in designated medically underserved rural areas. Many CARHC's members are enrolled in the Medi–Cal program as providers and have provided dental and podiatry services to Medi–Cal beneficiaries. (RUF ¶ 8.) CARHC brings this suit on its own behalf and in its representative capacity on behalf of its members who have been directly and adversely affected by the discontinuation of Medi–Cal reimbursement for dental, podiatry, optometry or chiropractic services. (RUF ¶ s 9–10.)

Plaintiff ACHC is a California non-profit corporation with its principal place of business in Avenal, California, a designated medically underserved area. (RUF ¶ 12.) Avenal is also a designated dental professional shortage area.[4] (RUF ¶ 13.) ACHC is an approved FQHC as defined by the Medicaid Program in 42 U.S.C. § 1396 ($l$)(2), and provides health care services to Medi–Cal recipients, among others. (RUF ¶ s 16–17, 18.) As an FQHC, ACHC is required to provide care to all patients without regard to their ability to pay for such services. (RUF ¶ 19.)

ACHC, as well as other FQHCs, are also required to maintain sliding fee scale policies that provide for, among other things, a 100% discount to patients whose incomes are below 100% of the Federal Poverty Guidelines, permitting only a nominal charge. (RUF ¶ 20.)

Both RHCs and FQHCs can seek federal reimbursement for certain health services provided to Medi–Cal beneficiaries; not all services, however, provided by these types of clinics are reimbursable. (*See* RUF ¶ s 18, 23, 28, 45, 46.)

In February 2009, in response to California's fiscal emergency, the California legislature enacted budget measures to reduce certain state programs, including through § 14131.10, the elimination of coverage for certain Medicaid benefits it deemed "optional" under federal law. In pertinent part, § 14131.10 provides:

(a) Notwithstanding any other provision of this chapter, ... in order to implement changes in the level of funding for health care services, specific optional benefits are excluded from coverage under the Medi–Cal program.

(b) (1) The following optional benefits are excluded from coverage under the Medi–Cal program:

(A) Adult dental services, except as specified in paragraph (2).

. . .

(D) Chiropractic services.

(E) Optometric and optician services, including services provided by a fabricating optical laboratory.

---

4. Such a designation identifies areas as having a shortage of dental providers on the basis of availability of dentists and dental auxiliaries. In order to receive the designation, an area must have a dentist-to-population ratio below a set minimum and demonstrate a lack of access to dental care in surrounding areas because of distance, overutilization or access barriers. (RUF ¶ s 14–15.)

(F) Podiatric services.[5]

. . .

(2) Medical and surgical services provided by a doctor of dental medicine or dental surgery, which if provided by a physician, would be considered covered physician services, and which services may be provided by either a physician or a dentist in this state, are covered.

. . .

(d) This section shall only be implemented to the extent permitted by federal law.

The law became effective July 1, 2009. Prior to that time, RHCs and FQHCs were reimbursed for these services. (RUF ¶s 24–27.) Plaintiffs maintain that as a result of defendants' implementation of § 14131.10 since July 1, 2009, RHCs and FQHCs have not received Medi–Cal reimbursement from DHCS for most adult dental, podiatry, chiropractic and optometry services, other than Federally-required adult dental services ("FRADS"), specified in § 14131.10(b)(2).

Specifically during this time, plaintiffs have received significantly reduced Medi–Cal reimbursement for the services eliminated by the statute. (RUF ¶s 46–52.) In that regard, plaintiffs proffer evidence that: Adventist Health RHCs have received payments for dental and podiatry services for the period July 1 to Dec. 31, 2009 that are 25 to 30% less than the payments for dental and podiatry services for the first half of 2009. (RUF ¶s 9–11, 48.) Likewise, Medi–Cal payments for plaintiff ACHC for dental, podiatry and optometry services for the period July 1,

2009 to March 31, 2010, were approximately $19,000 per month less than the payments for these services during the preceding six months. (RUF ¶ 53.) Plaintiffs maintain that this decrease in payment has occurred during a period when they have seen an increase in demand from patients who are uninsured, and maintain that over time, RHCs and FQHCs will be forced to discontinue providing these services to their patients. (RUF ¶s 49, 54–55, 57.)

### 2. *Essential Statutory Background*

#### a. Federal Medicaid Law

Title XIX of the Social Security Act (the "Medicaid Act") establishes a cooperative federal—state program that provides federal funding to states that choose to participate for medical assistance to low—income persons. 42 U.S.C. § 1396. Medicaid is jointly financed by federal and state governments and administered by the states through a Medicaid State Plan approved by the Secretary for Health and Human Services ("HHS"). *Id.* at § 1396a. In exchange for federal matching funds, participating states agree to comply with federal Medicaid laws and regulations. 42 U.S.C. § 1396c; *see also* 42 C.F.R. § 430.35. CMS administers the Medicaid program on the Secretary of HHS' behalf, including approving State Plans. A State Plan specifies the services that the State has determined that it will provide. 42 U.S.C. § 1396d(a). Each State Plan must include seven specific types of medical services. *Id.* at §§ 1396a(a)(10), 1396d(a)(1)-(5), (17), (21). One of these seven services is RHC/FQHC services, the scope of which is at issue in this case.

---

**5.** The statute also excludes from coverage under Medi–Cal the following services which are not at issue on the motion: acupuncture services; audiology and speech therapy services; psychology services; and incontinence creams and washes. Cal. Wel. & Inst.Code § 14131.10(b)(1)(B), (C), (G) and (H).

*Id.* at § 1396d(a)(2)(B) & (C). California's Medicaid Program is known as the California Medical Assistance Program, or "Medi–Cal." As the single state agency responsible for the Medi–Cal program, DHCS supervises and administers the State Plan. It also submits any amendments to the State Plan to CMS for review and approval. 42 C.F.R. §§ 430.12, 430.14, 430.15.

Additionally, DHCS is responsible for ensuring that the Medi–Cal program provides covered services to eligible beneficiaries and for reimbursing providers for providing those covered services in compliance with the State Plan and with federal and state laws and regulations. *Id.* at §§ 431.1, 431.10. To be a covered service, the service must be included in the State Plan and provided by an approved Medi–Cal provider to a Medi–Cal beneficiary. *See generally* 42 C.F.R. § 430.10.

### b. RHC and FQHC Provisions under the Medicaid Act

As stated above, Medicaid requires that participating states, like California, include coverage for certain specified services in their State Plan. 42 U.S.C. § 1396a(a)(10) (referring to 42 U.S.C. § 1396d(a)(1)-(5), (17), (21) and (28)). Section 1396a(a)(10) provides:

A State plan for medical assistance must—... (10) provide—(A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21) and (28) of section 1396d(a) of this title ...

Section 1396d(a)(2) specifically addresses "rural health clinic services" and "Federally-qualified health center services." [6] A state may also "opt" to include in the State Plan any of the other services listed in 42 U.S.C. § 1396d(a), such as dental services. *See id.* at § 1396d(a)(10).

Required Medicaid services thus include payment of RHC/FQHC services. *Id.* at § 1396d(a)(2)(B) & (C). Pursuant to said Section, a state must provide "medical assistance" to RHC/FQHCs, which: "means payment of part or all of the cost of the following care and services ... [:]"

(B) consistent with State law permitting such services, rural health clinic services (as defined in subsection (*l*)(1) of this section) and any other ambulatory services which are offered by a rural health clinic (as defined in subsection (*l*)(1) of this section) and which are otherwise included in the plan, and (C) Federally-qualified health center services (as defined in subsection (*l*)(2) of this section) and any other ambulatory services offered by a Federally-qualified health center and which are otherwise included in the plan.

This provision defines "rural health clinic services" in reference to subsection (*l*)(1)

---

**6.** Section 1396d(a)(1) addresses "inpatient hospital services (other than services in an institution for mental diseases);" Section 1396d(a)(3) addresses "other laboratory and X-ray services;" Section 1396d(a)(4) addresses "nursing facility services;" Section 1396d(a)(5) addresses "(A) physicians' services furnished by a physician (as defined in section 1395x(r)(1) of this title), whether furnished in the office, the patient's home, a hospital, or a nursing facility, or elsewhere, and (B) medical and surgical services furnished by a dentist (described in section 1395x(r)(2) of this title) to the extent such services may be performed under State law either by a doctor of medicine or by a doctor of dental surgery or dental medicine and would be described in clause (A) if furnished by a physician (as defined in section 1395x(r)(1) of this title);" Section 1396d(a)(17) addresses "services furnished by a nurse-midwife;" Section 1396d(a)(21) addresses "services furnished by a certified pediatric nurse practitioner;" and Section 1396d(a)(28) addresses "free standing birth center services."

of § 1396d and also gives a State the option to reimburse an RHC for providing other non-specified ambulatory State Plan services. Subsection *(l)*(1) of § 1396d defines the terms "rural health clinic services" and "rural health clinic" as having the "meanings given such terms in section 1395x(aa) of this title, . . . ." Similarly, § 1396d(a)(2)(C) defines "Federally-qualified health center services" in reference to subsection *(l)*(2) of § 1396d and also gives a State the option to reimburse an FQHC for providing other non-specified ambulatory State Plan services. Subsection *(l)*(2) of § 1396d defines the term "Federally-qualified health center services" to mean "services of the type described in subparagraphs (A) through (C) of section 1395x(aa)(1) of this title when furnished to an individual as a patient of a Federally-qualified health center . . . ."

Title 42 U.S.C. § 1395x(aa) defines both "rural health clinic services" and "Federally-qualified health center services" to include: "physicians' services" (§ 1395x(aa)(1)(A)); "physician assistant or a nurse practitioner" services (§ 1395x(aa)(1)(B)); "clinical psychologist" services (§ 1395x(aa)(1)(B)); "clinical social worker" services (§ 1395x(aa)(1)(B)); and in the case of a RHC, in an area in which there exists a shortage of home health agencies, part-time or intermittent nursing care and related medical supplies furnished by a registered professional nurse or licensed practical nurse to a homebound individual under a written plan of treatment (§ 1395x(aa)(1)(C)).

To this point, the parties agree on the above description of the applicable law. They also agree that "physicians' services" as referenced in § 1395x(aa)(1) are considered the "core" services for which RHC/FQHCs are entitled to be reimbursed un-

der Medicaid. Where the parties diverge is in the next step: defining "physicians' services."

Plaintiffs argue because § 1396d defines RHC and FQHC services in reference to a *Medicare* provision— § 1395x(aa)—the court should similarly look to Medicare's definition of "physician" which is contained in § 1395x(r) and includes: (1) "a doctor of medicine or osteopathy" (§ 1395x(r)(1)); (2) "a doctor of dental surgery or of dental medicine" (§ 1395x(r)(2)); (3) "a doctor of podiatric medicine" (§ 1395x(r)(3)); (4) "a doctor of optometry" (§ 1395x(r)(4)); and (5) "a chiropractor" (§ 1395x(r)(5)). Plaintiff thus argues that all of these physicians' services must be reimbursed when provided by a RHC or FQHC. They assert that since Jan. 1, 2001, California's State Plan defined RHC/FQHC services to includes these six professionals, and § 14131.10 improperly denies reimbursement for these mandatory services.

Defendants contend to the contrary that there is no legal basis to turn to *Medicare* laws to define *Medicaid* requirements. Medicaid specifically defines "physicians' services" in § 1396d(a)(5)(A) as "services furnished by a physician (as defined in section 1395x(r)(1) of this title." Thus, it incorporates only part of Medicare's definition of "physician"—namely, subsection 1395x(r)(1), defining "physician" as "a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such functions or action." Thus, defendants argue that certain services of dentists, optometrists, podiatrists, and chiropractors are not mandatory services required to be reimbursed to RHCs and FQHCs.

Defendants emphasize that Medi–Cal continues to reimburse RHC/FQHCs for other mandatory services, including cer-

tain dental services, psychology and optometry services. 42 U.S.C. § 1396d(a)(5) and § 1396a(a)(10)(A). For example, defendants acknowledge that certain adult dental services are federally-required (the aforementioned "FRADS"); these include: "medical and surgical services furnished by a dentist (described in section 1395x(r)(2) of this title) to the extent such services may be performed under State law either by a doctor of medicine or by a doctor of dental surgery or dental medicine and would be described in clause (A) if furnished by a physician (as defined in section 1395x(r)(1) of this title)." 42 U.S.C. § 1396d(a)(5)(B). Section 14131.10(b)(2) specifically requires coverage for these services.[7]

Defendants also acknowledge that Medicaid expressly includes within the scope of covered mandatory RHC/FQHC services, "services furnished . . . by a clinical psychologist or by a clinical social worker . . . as would otherwise be covered if furnished by a physician." *Id.* at § 1395x(aa)(1)(B). As such, defendants point out that contrary to § 14131.10's exclusion of psychology services as an "optional benefit," DHCS has continued to reimburse RHC/FQHCs for these services, as the statute expressly provides that it "shall only be implemented to the extent permitted by federal law." Cal. Wel. & Inst.Code § 14131.10(d).

Finally, originally following the enactment of § 14131.10, DHCS did not reimburse for optometric services. However, DHCS recently reinstated reimbursement for these services and the reimbursement will be retroactive to July 1, 2009. Defendants concede the Medicaid Act requires payment for optometry services, even if not included in the State Plan, *if* the State Plan had previously provided these services. 42 U.S.C. § 1396d(e). Such is the case in California, and thus, defendants now agree that despite § 14131.10's exclusion of coverage, DHCS must reimburse RHCs and FQHCs for the provision of optometric services to Medi–Cal beneficiaries.

### 3. *Approval of State Plan Amendments*

The State Plan is a comprehensive written statement submitted by DHCS, describing the nature and scope of its Medicaid program and assuring it will be administered in conformity with the requirements of Medicaid law. 42 C.F.R. § 430.10 & 447.252(b). A State Plan must be approved by CMS before the State can receive federal funds for its Medicaid program. 42 U.S.C. § 1396, 1396b(a). When a State seeks to make changes to its approved State Plan, it must submit a State Plan Amendment ("SPA") to CMS so CMS may determine whether the amended State Plan contin-

---

**7.** As discussed more fully below, plaintiffs vigorously dispute this interpretation of Medicaid's requirements for payment of dental services. They maintain that federal law requires State Medicaid agencies to cover dental services more broadly when provided by a RHC/FQHC. Plaintiffs contend that the scope of coverage is determined by reference to the licensure category of the individual healthcare professional, rather than to a limited set of services covered when delivered by such a professional, citing § 1395x(aa) (1)(A)-(C). As support for its interpretation, plain-

tiffs cite a 2003 email of Bernadette Quevedo–Mendoza, of the Office of the Regional Administrator for CMS Region VII) ("Quevedo–Mendoza email"), who advised the State of North Dakota that "dental services provided by the FQHC or RHC [must] be reimbursed even if the state drops optional dental services." (RUF ¶ 39.) Plaintiffs assert under *Skidmore v. Swift and Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) such a federal agency's construction of a statute is entitled to "respect."

ues to comply with federal requirements. 42 C.F.R. § 430.12. CMS may approve or disapprove of the SPA or it may request more information before making a determination. *Id.* at § 430.16. If CMS fails to act upon a submitted SPA within 90 days, the amendment is deemed approved. *Id.* A request for more information stops the 90–day clock. *Id.* at §§ 430.16(a)(2); 447.256(b).

Here, DHCS submitted a SPA on June 30, 2009 which proposed to substantially exclude coverage of the subject eight Medicaid benefits provided by RHCs and FQHCs as stated in § 14131.10. (RUF ¶s 32–34.) On October 22, 2009, CMS advised DHCS that the proposed SPA was not approvable as drafted and requested additional information. (RUF ¶ 35.) To date, no SPA has yet been approved excluding coverage of any of the Medicaid benefits listed in § 14131.10. (RUF ¶ 36.)

### STANDARD

Under Federal Rule of Civil Procedure 56, a court shall grant a motion for summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(C). Here, the parties agree that the material facts in this action are not in dispute. Thus, it is appropriate for the court to resolve the purely legal questions presented by the action at the summary judgment stage.

### ANALYSIS

#### 1. *Federal Preemption*

Preliminarily, defendants argue plaintiffs' first claim fails because there does not exist a private right of action to challenge § 14131.10 on the basis of federal preemption.[8] Plaintiffs contend to the contrary that they have a private right to pursue an action against defendants under 42 U.S.C. § 1983, asserting a violation of the Supremacy Clause, on the basis of 42 U.S.C. § 1396a(bb) which mandates state payments for services furnished by RHCs and FQHCs. Section 1396a(bb) provides: A "State plan *shall provide for payment* for services ... furnished by a Federally-qualified health center and services ... furnished by a rural health clinic in accordance with the provisions of this subsection." (Emphasis added); *See also* § 1396a(bb)(2)-(4) repeating the same. Subsections 1396a(bb)(5)(A) and 1396a(bb)(6)(B) further provide the procedure and methodology for payment of the services: "The State plan *shall provide for payment* to the center or clinic of supplemental payments, no less frequently than every 4 months, in the event that payments by Medicaid managed care plans are less than the minimum reimbursement rate determined under 1396a(bb)." 42 U.S.C. § 1396a(bb)(5)(A) (emphasis added). Providing for an alternative payment methodology, § 1396a(bb)(6)(B) provides that such methodology must *"result[ ] in payment* to the center or clinic of an amount which is at least equal to the amount otherwise required to be paid to the center or clinic under this section." *Id.* at § 1396(bb)(6)(B) (emphasis added).

■ In *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Supreme Court established a three prong test for determining whether

**8.** Defendants challenge the viability of plaintiffs' § 1983 claims, raising federal preemption and failure to receive federal approval of a SPA, solely on the ground of a lack of a private right of action; they do not oppose plaintiffs' motion on the issues that (1) plaintiffs are "persons" entitled to relief under § 1983 and (2) the individual defendants acted under color of state law as required by § 1983.

a particular federal statute can be enforced through a private right of action under Section 1983. The *Blessing* test requires that: (1) Congress intended the statutory provision to benefit the plaintiff; (2) the asserted right is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the provision couch the asserted right in mandatory rather than precatory terms. *Id.* In *Gonzaga University v. Doe,* 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Court emphasized that in finding a private right of action, "a court must be careful to ensure that the statute at issue contains 'rights-creating language' and that the language is phrased in terms of the persons benefitted, not in terms of a general 'policy or practice.'"

Plaintiffs concede the Ninth Circuit has yet to address the issue; however, they rely on several other circuits' decisions which have found that § 1396a(bb) gives rise to a right enforceable under Section 1983 because the statute evidences Congress' intent to benefit RHC/FQHCs, and it requires action on the part of the states, *i.e.,* that the states reimburse RHC/FQHCs for services provided to Medicaid patients. For example, in *Pee Dee Health v. Sanford,* 509 F.3d 204 (4th Cir.2007), the Fourth Circuit held that § 1396a(bb) contained the type of "rights-creating" language required by *Gonzaga,* thus establishing a private right of action. There, plaintiff Pee Dee was a RHC serving Medicaid recipients and it brought a claim alleging that the reimbursement formula used by the South Carolina Medicaid agency violated Pee Dee's statutorily conferred right to proper reimbursement under § 1396a(bb). In this case of first impression, where the court considered whether § 1396a(bb) "read as whole" provided a private right of action,[9] the Fourth Circuit held that Congress intended in § 1396a(bb) to benefit RHCs as they are specifically described by the statute which designates them as the recipient of payment, the rights conferred by the statute were not vague, and mandatory action was required by the states (they are directed to "provide for payment of services ... furnished by" RHCs). Thus, all of the *Blessing* factors were met, permitting Pee Dee's action under § 1396a(bb). *Id.* at 211.

Similarly, in *Rio Grande Community Health Center, Inc. v. Rullan,* 397 F.3d 56, 74 (1st Cir.2005), the First Circuit concluded that FQHCs could bring an action under § 1983 to enforce § 1396a(bb)(5)(A)'s requirements for the calculation of and time frame for supplemental payments. The court found the statutory language that a "State plan 'shall provide for payment to [FQHCs] ... by the State of a supplemental payment'" to be rights-creating language which was mandatory and had a clear focus to benefit FQHCs, rather than the regulated states. *Id.; accord Concilio de Salud Integral de Loiza, Inc. v. Perez–Perdomo,* 551 F.3d 10, 17–18 (1st Cir.2008) (finding FQHCs had the right, under § 1983, to enforce § 1396a(bb)'s reimbursement methodology to ensure that supplemental payments were properly calculated and made); *see also Chase Brexton Health Services, Inc. v. Maryland,* 411 F.3d 457, 459–60 (4th Cir.2005) (FQHCs had the right to challenge state's method of calculating reimbursement); *Community Health Ctr. v. Wilson–Coker,* 311 F.3d 132, 135–36 (2nd Cir.2002) (FQHC could

9. In previous cases, courts had considered whether certain subsections of § 1396a(bb) provided a private right of action. *See e.g. Rio Grande* below.

bring challenge to State's reimbursement formula as violating federal law).

Defendants contend that these cases are distinguishable because what is at issue here is the *scope* of covered services, not § 1396a(bb)'s right of reimbursement. Defendants assert § 1396a(bb) only addresses the rights of these providers to receive payment for services; it does not address the scope of such services. And, the applicable statutes establishing what is a covered service (either § 1396x(r)(1)-(5) as asserted by plaintiffs or § 1396x(r)(1) only as asserted by defendants) are purely definitional and have no rights-creating language establishing a private right of action to enforce the provisions.

■ Defendants' argument is both incorrect and circular. First, § 1396a(bb)(1) specifically identifies the set of services that must be reimbursed by State Medicaid agencies, like DHCS:

> Beginning with fiscal year 2001 with respect to services furnished on or after January 1, 2001, and each succeeding fiscal year, the State Plan shall provide for payment for services described in section 1396d(a)(2)(C) furnished by a [FQHC] and services described in section 1396d(a)(2)(B) furnished by a [RHC] in accordance with the provisions of this subsection.

Thus, contrary to defendants' characterization, Section 1396a(bb) *does* define the scope of services for which RHC/FQHCs are entitled to reimbursement. Accord-

ingly, there is no factual basis to distinguish the decisions of the First, Second and Fourth Circuits finding a private right of action under § 1396a(bb).

Moreover, defendants appear to be arguing that because § 1396a(bb) incorporates defined terms it cannot give rise to a private right of action. However, they cite no case law in support of this argument. Indeed, defendants concede that the First, Second and Fourth Circuits have recognized private rights of action for RHC/FQHCs to enforce § 1396a(bb). This right would be meaningless if its exercise did not extend to ensuring a provider's ability to receive payment for *particular* services which federal law requires State programs to cover.

Finally, contrary to defendants' argument, plaintiffs here are pressing their own rights to restore coverage for services State Medicaid programs are required to cover, thereby insuring they will receive payment for furnishing these mandatory services. Plaintiffs are not bringing suit on behalf of plan beneficiaries, trying to effectuate beneficiaries' rights to particular services, and thus, there is no standing impediment.

In sum, plaintiffs properly rely on § 1396a(bb) as the source of the right they seek to enforce by this action; as consistently recognized by several other circuits, said statute affords a private right of action under the test as enunciated by the Supreme Court in *Blessing* and *Gonzaga.*[10]

■ As to the merits, plaintiffs' Supremacy Clause claim is predicated upon a

---

**10.** Because the court finds that a private right of action exists, it need not consider defendants' argument that the court should nonetheless stay the action pending their pursuit of three certiorari petitions before the Supreme Court. Defendants contend that before the Supreme Court is the issue of whether a private party may bring a Supremacy Clause

claim when it lacks a private right of action under Section 1983. Plaintiffs dispute this description of the pending issue, claiming that the certiorari petitions are wholly unrelated to this action as they involve the issue of whether the State is required under the Medicaid statutes to assess the impact on the quality of care and access to care before rate

theory of federal conflict preemption. Under general principles of federal preemption, state law is preempted only to the extent that it actually conflicts with federal law. Such a conflict may arise either where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Conflict preemption, in which compliance with both federal and state law is impossible, occurs when the State law would allow a different result than the applicable federal law. *See Cal. Pharm. Ass'n v. Maxwell Jolly*, 630 F.Supp.2d 1154, 1158 (C.D.Cal.2009), citing *Pacific Gas & Elec. Co. v. State Energy Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

As set forth above, plaintiffs claim that § 14131.10 improperly excludes coverage for core services benefits which federal law requires States to pay for when furnished by a RHC/FQHC. Such services, plaintiffs contend, are mandatory since "physician" is defined to include, among others, dentists, podiatrists, and chiropractors. 42 U.S.C. § 1395x(r)(1) to (5).

Plaintiffs maintain this Medicare definition applies, as opposed to the general definition of "physicians' services" applicable to all Medicaid providers that are not RHC/FQHCs, (1) as a matter of straight statutory construction and/or (2) because Congress "clearly intended" the scope of reimbursable RHC/FQHC services under Medicaid to be broader than for other Medicaid providers.

Plaintiffs contend the applicable statutes mandate this court apply the Medicare definition of "physician" to define the mandatory services since the Medicaid Act incorporates a Medicare definition of RHC and FQHC services. According to plaintiffs, the court must stay within the confines of Medicare to further define the applicable services.

With respect to Congressional intent, plaintiffs cite § 1396d(a)(2)(B) and (C) which require the State to pay RHC/FQHCs for all services defined by subsection *(l)*(1) and (2) *and* any other ambulatory services offered by the providers which are otherwise included in the plan. The statutes also require payment to RHC/FQHCs for services provided by these providers' physician assistants, nurse practitioners, clinical psychologists, or clinical social workers. § 1395x(aa)(1)(B). This plaintiffs argue demonstrates that Congress wanted to ensure access to a more comprehensive set of minimum benefits when services were furnished by RHC/FQHCs who care for medically underserved communities.[11]

changes are implemented. The court need not resolve this dispute as it finds a private right of action does exist and therefore must reach the merits of this action.

11. At oral argument, plaintiffs abandoned their Congressional intent argument raised in their reply, and instead argued that the statutes were clear, on their face, and thus, the court need look no further than the plain statutory language to find in their favor. The court does not agree for the reasons set forth below. However, as a result of plaintiffs'

concession at oral argument, the court does not consider the issue of Congressional intent herein. The court will note, nonetheless, that plaintiffs' argument regarding Congressional intent is more properly construed as an extension of their statutory construction argument, as they do not proffer any legislature history or other outside sources in support of their argument, but rather cite to other *statutory* provisions and argue that this court can glean Congressional intent from those provisions.

Plaintiffs also assert the court should give deference to two statements of opinion by CMS which they allege support their interpretation of the statutes at issue. First, plaintiffs' contend the court should defer to the Quevedo–Mendoza email wherein Quevedo–Mendoza told the State of North Dakota that even if it rendered dental services optional, reimbursement must continue with respect to RHC/FQHCs for these services. (*See* n. 7 *supra.*) Plaintiffs also cite a 2003 opinion letter of Dennis Smith, CMS' Director (the "Smith Letter"), wherein he stated that "the definition of FQHC services is the same for Medicaid as it is for the Medicare program." (RUF ¶ 43.)

Defendants respond that plaintiffs' argument is premised on an erroneous interpretation that the federal *Medicare* definition of "physician" governs for purposes of RHC/FQHC services provided to a *Medicaid* recipient. Defendants argue it is significant that Medicaid and Medicare define physician differently as set forth above: Medicaid limits the term to doctors of medicine and osteopathy (§ 1396d(a)(5)(A) [limiting the definition of "physician" to the definition in § 1395x(r)(1) only) while Medicare defines the term to include these doctors as well as dentists, podiatrists, optometrists and chiropractors (§ 1395x(r)(1)-(5)). Defendants emphasize case law recognizing that identical words in the same statutory scheme "need not have the same meaning 'when the identical word is used in different provisions that address disparate subjects.'" (Opp'n, filed Sept. 22, 21010, at 14–15.) Here, defendants argue given the different patient populations of Medicaid—low income persons—versus Medicare—the elderly—it is logical that the programs may have differing scopes and limitations. Since the court is considering application of Medicaid's re-

quirements, defendants assert the court should turn to Medicaid's definitions unless the statute expressly requires otherwise.

■■■ The court agrees with defendants, as the starting point must be the statutory language itself. It has long been the rule that "when the statutory language is plain, the sole function of the courts ... is to enforce it according to its terms." *Arlington Cent. Scho. v. Murphy,* 548 U.S. 291, 296–97, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006). Here, nothing in the applicable statutes directs this court to the Medicare definition of "physician" contained in § 1395x(r)(1)-(5). Indeed, the precise term at issue is not "physician" but "physicians' services." 42 U.S.C. § 1395x(aa)(1)(A) (defining RHC and FQHC services to include "physicians' services"). That specific term is defined by the applicable Medicaid Act; § 1396d(a)(5)(A) defines "physicians' services" as: "services furnished by a physician (as defined in section 1395x(r)(1) of this title)." Thus, the specific provision directly defining "physicians' services" limits the definition to only those physicians described in § 1395x(r)(1); namely, "a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such functions or actions." 42 U.S.C. § 1395x(r)(1).

Although not raised by defendants, the court is also not compelled by plaintiffs' statutory construction argument considering that numerous subsections of § 1395x(r)(2)-(5) contain certain qualifications which only relate to the *Medicare* statute. For example, as opposed to § 1395x(r)(1) which contains *no* qualification under Medicare, § 1395x(r)(3) defines a doctor of podiatric medicine "for the purposes of subsections (k), (m), (p) (1) and

(s) of this section [the Medicare statute] . . . ." There are similar qualifications for optometrists and chiropractors. Sections 1395x(r)(4) and (5) define these doctors only for purposes of certain *Medicare* provisions; § 1395x(r)(4) reads: "a doctor of optometry, *but only for purposes of* subsection (p) (1) and with respect to the provision of items or services described in subsection (s) of this section which he is legally authorized to perform as a doctor of optometry by the State in which he performs them;" § 1395x(r)(5) provides: "a chiropractor who is licensed as such by the State (or in a State which does not license chiropractors as such, is legally authorized to perform the services of a chiropractor in jurisdiction in which he performs such services), and who meets uniform minimum standards promulgated by the Secretary, *but only for the purposes of subsections (s)(1) and (s)(2)(A) of this section* and only with respect to treatment by means of manual manipulation of the spine (to correct a subluxation) which he is legally authorized to perform by the State or jurisdiction in which treatment is provided." Contrary to plaintiffs' argument, these qualifications suggest that the statute was intended to describe these types of doctors only with respect to Medicare.

Finally, the court does not find plaintiffs' citation to the Quevedo–Mendoza email and Smith Letter persuasive. First, other than a conclusory citation to *Skidmore* in one sentence of its moving papers, plaintiffs fail to demonstrate what level of deference, if any at all, should be paid by this court to these types of opinion statements. Moreover, and more significantly, plaintiffs wholly fail to describe how these specific opinions relate to the present issues. It is not clear that the Mendoza email supports plaintiffs' position at all, as her remarks could also be construed as indicating that

States may not withdraw coverage of FRADS services provided by RHC/ FQHCs, rather than general adult dental services. Similarly, the full context of the Smith Letter is not clear. It appears he was addressing only specific provider types, including clinical psychologists, social workers and nurse practitioners that provide a particular classification of services (behavioral services). Thus, it is not apparent that his remarks, made nearly seven years ago in 2003, even address the pertinent issue here.

Accordingly, considering the relevant statutes' clear direction, the court must find that Medicaid's plain and unambiguous definition of "physicians' services" controls the scope of RHC/FQHC services required under federal Medicaid law. Because that definition renders only the services of doctors of medicine and osteopathy mandatory services, plaintiffs have not shown a conflict in federal and state law. § 14131.10's exclusion of adult dental, podiatric and chiropractic services is not in conflict with the mandates of federal Medicaid law, and thus, plaintiffs' motion for summary judgment on their claim of federal preemption is denied.

### 2. *Prior Approval of SPAs*

Plaintiffs argue defendants have violated federal law by implementing § 14131.10 without first receiving approval of their proposed SPA. Such prior approval is required, contend plaintiffs, by Ninth Circuit precedent. See *Exeter Memorial Hosp. Ass'n v. Belshe*, 145 F.3d 1106 (9th Cir. 1998), relying on *Washington State Health Facilities Ass'n v. Washington Dep't of Soc. & Health Servs.*, 698 F.2d 964 (9th Cir.1982) and *Oregon Ass'n of Homes for the Aging, Inc. v. State of Oregon*, 5 F.3d 1239 (9th Cir.1993). In *Exeter,* a Medicaid

provider brought a § 1983 action seeking a preliminary injunction to require DHCS to stop enforcement of its new Medi–Cal reimbursement rates prior to approval of a state plan amendment submitted to HHS. The court held, reaffirming its prior holdings in *Washington State Health* and *Oregon Ass'n of Homes*, that Plan "amendments changing payment methods and standards require [prior federal] approval." 145 F.3d at 1108. The court emphasized that its holding was not based on particular statutory language relating to plan amendments but rather on the "overall statutory framework." *Id.* That framework the court held required that "all plans receive approval by the federal government before they may be implemented, and that all amendments to plans must also be federally approved." *Id.* The court held that in *Washington State Health*, it determined that from these requirements "logically flows the requirement that amendments to plans must be approved before implementation." *Id.*

Defendants contend: (1) plaintiffs have no enforceable right to challenge a SPA; defendants contend that only the Secretary of HHS can challenge defendants' implementation of § 14131.10 without CMS approval (citing 42 U.S.C. § 1396c); (2) *Exeter* is distinguishable because it considered now repealed provisions of the Medicaid Act (the so-called Boren Amendment), and thus, its holding is inapplicable; and (3) in practice, CMS has consistently allowed DHCS to implement changes to pending SPA approvals to avoid significant delays in implementing reimbursement and/or benefit increases or reductions.

■ Each of defendants' arguments is unavailing. First, § 1396c does not preclude plaintiffs' pursuit of this action; it merely authorizes the Secretary of HHS to terminate State funding if he finds that a State Plan is not in compliance with federal law. The statute does not preclude a private suit by a provider. Moreover, in *Exeter, Washington State Health* and *Oregon Ass'n of Homes,* the Ninth Circuit permitted similar challenges under § 1983: In *Exeter,* a Medicaid provider brought a § 1983 action seeking a preliminary injunction to require DHCS to stop enforcement of new Medi–Cal reimbursement rates prior to approval of a SPA by HHS; in *Washington State Health,* plaintiff association of health facilities sought to enjoin the Secretary of Washington State Department of Social and Health Services from enforcing a state regulation that conflicted with the federally approved State Medicaid Plan until the amendment to the plan was approved by HHS; in *Oregon Ass'n of Homes,* nursing homes brought an action challenging California's reclassification of nursing services into rate categories receiving lower reimbursement under the State's Medicaid Plan on the ground the State failed to submit a SPA to HHS. Thus, controlling law in this circuit permits the very type of challenge brought by plaintiffs in this case. Indeed, in *Washington State Health,* the court expressly held that while plaintiffs did not plead a cause of action under § 1983, "it is clear that they are properly in federal court under this provision." 698 F.2d at 965 n. 4.

Second, *Exeter* controls here. The Ninth Circuit did not tie its holding to any specific statutory language, and thus, the subsequent repeal of the Boren Amendment does not render the decision inapposite to this case. The Ninth Circuit based its decision on the "overall statutory framework," finding that considered as a whole, that framework required that amendments to plans be approved before

implementation. 145 F.3d at 1108. In fact, the arguments defendants raise here were specifically rejected by this court in the underlying decision in *Exeter* which the Ninth Circuit expressly adopted. *Id.* (stating "[w]e adopt [Judge Levi's] opinion in *Exeter Memorial Hosp. Ass'n v. Belshe*, 943 F.Supp. 1239 (E.D.Cal.1996)" holding *"approval is required before implementation of amendments to the Plan"*) (emphasis added). Defendants argue that 42 C.F.R. §§ 430.16 and 447.256 support the view that "by its own regulations, the federal Medicaid statute permits implementation of a rate change before a state submits a SPA" or seeks approval of any amendment. To the contrary, Judge Levi found that § 447.256(C), requiring that a "State Plan amendment that is approved will become effective not earlier than the first day of the calendar quarter in which an approvable amendment is submitted" must be read consistently with the proposition that plan amendments must be approved prior to any implementation—as the regulation provides that a SPA will "become" effective retroactively but only after federal approval. 943 F.Supp. at 1244. Judge Levi also rejected the argument that the regulations establish that CMS' request for more information operates as an "approval." Instead, he held the regulations make clear that a plan is "approved" only when CMS is satisfied with the State's assurances that the amended plan remains in compliance with the Act. *Id.;* 42 C.F.R. §§ 447.253(a); 430.16.

Thus, as Judge Levi held, to permit implementation of a SPA without federal approval would enforce a reimbursement plan for an indeterminate period,[12] that has never been approved, that may not be approved, and that may be inadequate under the law. This would be wholly "inconsistent with the function of the State plan, the approval process for the State plans and amendments, and the [express federal] directive that the States 'must pay' reimbursement according to the methods specified in an approved State plan." 943 F.Supp. at 1243.

Finally, defendants' claims that CMS has in practice permitted such prior implementation of a SPA is not relevant to the court's legal inquiry—what may happen in practice does not control what the law requires. (*See* Orlich Decl., filed Sept. 22, 2010 [Docket # 19–3].)[13]

Plaintiffs are entitled to a declaration providing that defendants' implementation of § 14131.10 prior to receipt of federal approval of its SPA violates federal law, and as in *Exeter*, an injunction enjoining implementation of § 14131.10 with respect to the at-issue services until the State's SPA is approved by CMS.[14]

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANT-

---

**12.** Once the agency requests more information the 90 day clock stops indefinitely.

**13.** Vickie Orlich, Division Chief of the Benefits, Waiver Analysis and Rates Division of DHCS, declared that "CMS has consistently allowed DHCS to implement changes in the scope of benefits or in payment methodologies before issuing approval of a SPA. CMS has always allowed DHCS to claim and receive federal Medicaid funding in accord with scope of benefit or reimbursement methodology changes pending their reviewing of a SPA

concerning the particular changes. I am not aware of CMS ever requesting DHCS to postpone implementation of a SPA scope of benefit or reimbursement methodology change until CMS has approved the SPA." (*Id.* at ¶ 10.)

**14.** Defendants did not oppose plaintiffs' motion on the issue of irreparable harm, and the court finds based on the proffered evidence set forth above, that plaintiffs have shown sufficient irreparable harm if an injunction does not issue. Plaintiffs' monetary injuries are deemed to constitute irreparable harm

ED in part and DENIED in part. The motion is DENIED with respect to the issue of federal preemption; plaintiffs have not shown that § 14131.10 conflicts with federal law mandates under the Medicaid Act. However, plaintiffs' motion is granted with respect to their challenge to defendants' implementation of § 14131.10 without first receiving CMS approval of their proposed SPA. As to that issue, plaintiffs are entitled:

(1) to a declaration providing that defendants' implementation of § 14131.10 prior to receipt of federal approval of its SPA violates federal law; and

(2) an injunction enjoining further implementation of § 14131.10 with respect to the subject adult dental, podiatry and chiropractic services until the State's SPA is approved by CMS.

The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

because DHCS' status as a branch of the State government bars plaintiffs from recovering damages in federal court under Eleventh Amendment sovereign immunity protections. *See California Pharmacists Ass'n v. Maxwell–Jolly,* 563 F.3d 847, 851–52 n. 2 (9th Cir.2009) ("[B]ecause the Hospital Plaintiffs and their members will be unable to recover damages against the Department even if they are successful on the merits of their case, they will suffer irreparable harm if the requested injunction is not granted.")

Defendants likewise do not oppose the motion on the issue of the balance of equities. To the extent the court finds a legal violation, defendants do not dispute the balance of equities tips in favor of issuance of an injunction. Here, there is no outweighing, countervailing interest; while California has sought to implement § 14131.10 as a budget measure, under the circumstances, that interest does not outweigh plaintiffs' essential role in California's health care safety net, the need for continued Medicaid reimbursement to sustain the delivery of services to Medicaid and uninsured beneficiaries, and the interests of Medicaid beneficiaries in receiving the full scope of RHC/FQHC services benefits as defined by Congress.