Filed 6/19/18

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| AMERICAN INDIAN HEALTH & SERVICES CORPORATION et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> JENNIFER KENT, as Director, etc., et al., <br><br> Defendants and Appellants. | C081338 <br><br> (Super. Ct. No. 34-2014-80001828-CU-WM-GDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, Christopher E. Krueger, Judge. Affirmed.

Xavier Becerra, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Susan M. Carson, Gregory D. Brown, and Dane C. Barca, Deputy Attorneys General, for Defendants and Appellants.

Hanson Bridgett, Kathryn E. Doi, Rachael E. Blucher, and Ann Mary Olson for Plaintiffs and Respondents.

1

The State Department of Health Care Services and its director (collectively, the Department) appeal from a judgment in favor of plaintiffs on a petition for a writ of mandate. Plaintiffs are 23 federally qualified health centers (FQHC's) and rural health clinics (RHC's) that serve medically underserved populations (the Clinics). (42 U.S.C. §§ 254b(a)(1), 1396d(*l*)(1), (2), 1395x(aa)(2), (4).) The dispute is over coverage for adult dental, chiropractic, and podiatric services the FQHC's and RHC's provided to Medi-Cal patients for a period between 2009 and 2013.

Prior to July 1, 2009, the Department processed and paid claims for these services. In 2009, in a cost-cutting measure due to budget problems, the Legislature enacted Welfare and Institutions Code section 14131.10[1] to exclude coverage for these services (and others) "to the extent permitted by federal law." (§ 14131.10, subd. (d).) After the Department stopped paying claims for these services, various FQHC's and RHC's challenged the validity of section 14131.10, claiming it conflicted with federal Medicaid law.

In *California Assn. of Rural Health Clinics v. Douglas* (9th Cir. 2013) 738 F.3d 1007 (*CARHC*), the Ninth Circuit held section 14131.10 was invalid to the extent it eliminated coverage for these services when provided by FQHC's and RHC's because the federal Medicaid Act imposed on participating states the obligation to cover these services by these providers.

In response to *CARHC*, the Department announced it would reimburse FQHC's and RHC's for these services for dates of service *only on or after* September 26, 2013, the date of the Ninth Circuit's mandate. Seeking reimbursement for services provided prior to September 26, 2103, the Clinics petitioned in Sacramento County Superior Court for a writ of mandate to compel the Department to accept, process, and pay claims for

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

these services for the period July 1, 2009, to September 26, 2013.  The trial court granted the petition in part and entered judgment for the Clinics.  The court issued a peremptory writ commanding the Department to process and pay for adult dental, chiropractic, and podiatric services provided by FQHC's and RHC's between July 1, 2009, and September 26, 2013, and to follow existing regulations regarding late claims.

The Department appeals.  Characterizing the Clinics' writ petition as a suit for damages, it contends (1) sovereign immunity bars the Clinics' claims for retroactive payment; (2) the *CARHC* decision is not -- and cannot be -- retroactive because the Medicaid Act is spending clause legislation and its terms were not sufficiently clear as to the requirement to cover adult dental, chiropractic, and podiatric services provided by FQHC's and RHC's; and (3) retroactive relief violates the separation of powers doctrine because it forces the Legislature to appropriate money.

We disagree with the Department's characterization of the Clinics' lawsuit. Rather than a suit for damages, the lawsuit seeks an order to compel performance of a mandatory duty and did not result in a money judgment.  Under well-settled California law, such a mandamus proceeding is not barred by sovereign immunity.  The Department's contentions based on spending clause legislation and separation of powers are new arguments raised for the first time on appeal.  We exercise our discretion to consider only the spending clause argument.  We reject it because the Department has not shown its obligations under Medicaid law, as determined by *CARHC*, came as a surprise. The separation of powers argument raises factual issues about appropriations that should have been presented in the trial court and we decline to consider this new argument.

Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Medicaid and Medi-Cal*

"Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care

3

to needy individuals.  [Citation.]  Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the Medicaid Act . . . and regulations promulgated by the Secretary of Health and Human Services (Secretary).  To qualify for federal assistance, a State must submit to the Secretary and have approved a 'plan for medical assistance,' [citation], that contains a comprehensive statement describing the nature and scope of the State's Medicaid program.  [Citation.] The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals." (*Wilder v. Virginia Hosp. Assn.* (1990) 496 U.S. 498, 502 [110 L.Ed.2d 455, 462].)

"To qualify for federal funds, States must submit to a federal agency (CMS [Centers for Medicare & Medicaid Services], a division of the Department of Health and Human Services) a state Medicaid plan that details the nature and scope of the State's Medicaid program.  It must also submit any amendments to the plan that it may make from time to time.  And it must receive the agency's approval of the plan and any amendments.  Before granting approval, the agency reviews the State's plan and amendments to determine whether they comply with the statutory and regulatory requirements governing the Medicaid program.  [Citations.]" (*Douglas v. Independent Living Center of S. Cal., Inc.* (2012) 565 U.S. 606, 610 [182 L.Ed.2d 101, 106].)

A state Medicaid plan must provide payment for services rendered by FQHC's and RHC's.  (42 U.S.C. § 1396a(bb); see *Three Lower Counties Community Health Services, Inc. v. State of Maryland* (4th Cir. 2007) 498 F.3d 294, 297; *Pee Dee Health Care, P.A. v. Sanford* (4th Cir. 2007) 509 F.3d 204, 207.)  FQHC's are health centers that serve a medically under-served population and RHC's are health centers that provide services in rural areas with insufficient numbers of healthcare practitioners.  (*CARHC, supra,* 738 F.3d at p. 1010.)

Medicaid requires participating states to cover certain mandatory services.  (42 U.S.C. § 1396a(a)(10).)  States may also receive federal funding for other optional

4

services.  (See 42 U.S.C. § 1396d(a)(1)-(29) [defining medical care and services for which payment is available].)

"The Medi-Cal program (§ 14000 et seq.) represents California's implementation of the federal Medicaid program [citation], through which the federal government provides financial assistance to states so that they may furnish medical care to qualified indigent persons.  [Citation.]  The Department is the single state agency designated to administer the Medi-Cal program. (§ 14203.)"  (*Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751.)

In 2009, California faced a budget crisis and sought to reduce Medi-Cal funding. The Legislature enacted section 14131.10 to exclude certain benefits it deemed optional from coverage under the Medi-Cal program.  A bill analysis explained:  "This bill contains necessary statutory changes to reduce expenditures for 2009-10 as directed to mitigate the fiscal emergency of the state declared by the Governor."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 5XXX (2009-2010 3d Ex. Sess.) as amended Feb. 14, 2009.)  Section 14131.10 provided:  "[I]n order to implement changes in the level of funding for health care services, specific optional benefits are excluded from coverage under the Medi-Cal program."  (§ 14131.10, subd. (a).)  As relevant here, the excluded services included certain adult dental services, chiropractic services, and podiatric services.  (§ 14131.10, subd. (b)(1)(A), (D), & (F).)  Recognizing the role of federal law in the Medi-Cal program, the statute further provided: "This section shall only be implemented to the extent permitted by federal law." (§ 14131.10, subd. (d).)

*Challenge to Section 14131.10 in Federal Court:  The CARHC Decision*

An association of RHC's and a FQHC brought suit in federal court to stop the implementation of section 14131.10.  In the federal action, the parties agreed "physicians' services" provided by RHC's and FQHC's were entitled to Medicaid reimbursement.  They disagreed as to the definition of "physician" and whether the

5

definition in Medicaid law or Medicare law applied. (*California Assn. of Rural Health Clinics v. Maxwell-Jolly* (E.D.Cal. 2010) 748 F.Supp.2d 1184, 1191 (*Maxwell-Jolly*), revd. & remanded *sub nom*. *CARHC, supra,* 738 F.3d 1007.) The federal district court ruled the Medicaid definition applied and section 14131.10 was not in conflict with federal Medicaid law. (*Maxwell-Jolly, supra*, at p. 1198.) It also ruled that the Department violated federal law by implementing section 14131.10 prior to receipt of federal approval of the state plan amendment (SPA) and thus enjoined implementation of section 14131.10 until federal approval was received. (*Maxwell-Jolly, supra*, at pp. 1199-1201.)

The RHC's and the FQHC appealed, challenging the district court's holding that section 14131.10 was consistent with the federal Medicaid Act. Prior to briefing on appeal, CMS approved California's SPA, thus rendering the Department's cross-appeal of the injunction moot. (*CARHC, supra,* 738 F.3d at pp. 1011, 1017-1018.)

The Ninth Circuit held the Medicaid Act prohibited the limitations adopted in section 14131.10. (*CARHC, supra,* 738 F.3d at pp. 1010.) The court found "the question of statutory interpretation before us is difficult," but because Congress was not silent or ambiguous on the issue, but provided "a clear answer" in the statutory text, *Chevron* deference (see *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc*. (1984) 467 U.S. 837, 842-843 [81 L.Ed.2d 694, 702-703]) was not appropriate. (*CARHC, supra,* at p. 1014.) Analyzing the statutory scheme, the Ninth Circuit found Medicaid required state plans to cover "physicians' services" as defined in the Medicaid Act, which defined physicians only as doctors of medicine and osteopathy, *and separately* to cover RHC services and FQHC services. The Medicaid Act referred to the Medicare Act for the definition of RHC services and FQHC services; these services include "physicians' services." The Medicare statute defined "physician" more broadly than the Medicaid Act to include doctors of medicine and osteopathy, doctors of dental surgery and dental medicine, doctors of podiatry, doctors of optometry, and chiropractors. (*Id*. at p. 1016.)

6

"It is clear then that the 'physicians' services' that the Clinics provide, and for which they must be reimbursed, include not only the services furnished by doctors of medicine and osteopathy, but also the services furnished by dentists, podiatrists, optometrists and chiropractors." (*Ibid*.)

The Ninth Circuit concluded: "We hold that Medicaid imposes on participating states an obligation to cover 'rural health clinic services' and 'Federally-qualified health center services,' and Medicaid imports the Medicare definition of those terms. Thus, Medicare unambiguously defines the Clinics' services to include services performed by dentists, podiatrists, optometrists and chiropractors, in addition to services provided by doctors of medicine and osteopathy. Any alternate reading of the statute would do violence to Medicaid's command that the terms 'rural health clinic services,' 'rural health clinic' and 'Federally-qualified health center services' shall have the meanings given those terms in Medicare. [Citation.]" (*CARHC, supra,* 738 F.3d at pp. 1016-1017.)

After *CARHC*, the Department took the position that adult dental, podiatric, and chiropractic services provided by RHC's and FQHC's were reimbursable only for dates of service on or after September 26, 2013 (the date the Ninth Circuit issued the writ of mandate). The Department declared that such services provided before that date were not reimbursable.

*Proceedings in State Court*

The Clinics petitioned for a writ of mandate in the Sacramento County Superior Court. They sought an order requiring the Department "to process and pay claims for adult dental, podiatry, and chiropractic services that Petitioners provided to eligible Medi-Cal beneficiaries during the period July 1, 2009 to September 26, 2013." The Clinics sought a writ of mandate requiring the Department "to create an orderly process for the processing and payment" of the claims, including "extending the deadline for submission of claims" and assisting petitioners and other RHC's and FQHC's in

determining eligibility for claims when eligibility information is no longer on the Department's Web site.

The Clinics argued the Department should be compelled to create an orderly process for payment of retrospective claims. This process had to include making eligibility information, which was usually available on the Department's Web site for only one year, available back to July 1, 2009. There was a model for payment of retrospective claims; one had been implemented for the optometry benefit which the Department had excluded and then reinstated.

In opposition, the Department argued the Clinics' attempt to recover retroactive monetary relief was completely barred by sovereign immunity. It further argued the Clinics had not met the standard for a writ of mandate because the Department had no clear, ministerial duty to create a database for retroactive claims or to pay such claims. The Department asserted the *CARHC* decision was not retroactive as it changed a settled rule of law; the Department was following California law and federal law as determined by the district court. Finally, the Department objected that the Clinics brought suit in state court solely to avoid the bar of the Eleventh Amendment to the United States Constitution.

In reply, the Clinics noted the Medi-Cal Provider Manual included exceptions for late claims. They argued that to fully effectuate a mandamus order, the Department must make eligibility information available and provide more than 60 days, the time period set forth in regulations, to file a claim.

The trial court found the Department had a duty, imposed by federal law and California's decision to participate in Medicaid, to pay for adult dental, podiatric, and chiropractic services provided by RHC's and FQHC's and that duty could be enforced by mandate. The court clarified that although the Department had no duty to *extend* the deadline for claims, there were existing procedures permitting late claims for "good cause" that arguably applied to the circumstance at issue here. " 'Good cause' " was

8

defined as "circumstances beyond the control of the provider." (Cal. Code Regs., tit. 22, § 51008, subd. (b).) Special circumstances that excused a late claim included court decisions, provided the claim was made within 60 days of resolution of the circumstances causing delay. (Cal. Code Regs., tit. 22, § 51008.5, subd. (a)(5)(A).)

The trial court also clarified that it was not ordering the Department to accept any particular late claim or to *pay* anything; instead, it was ordering the Department to follow its existing regulations regarding late claims. Following these existing regulations would include the Department's exercising its discretion to determine whether there was good cause for the particular late claim and, if so, determining whether the claim was payable. Only after exercising its discretion and concluding there was good cause for late filing of a payable claim must the Department pay the claim in accordance with state and federal law. The court declined to extend the 60-day deadline in the regulations but left to the Department how to apply the regulation.

The trial court rejected the Department's sovereign immunity argument, finding this was an action in traditional mandamus, not an action for money damages. The Clinics did not seek money damages; instead, they sought a writ of mandate ordering the Department to comply with its duty to process and pay claims for services Medi-Cal was required to cover. The court also rejected the argument that the *CARHC* decision was not retroactive. It found section 14131.10 was not "settled" law as it had been challenged approximately nine months after it was enacted.

## DISCUSSION

### I

### *Sovereign Immunity*

The Department first contends the Clinics' claims are barred by sovereign immunity because they are seeking retroactive monetary relief. As we explain, we disagree.

"The general expression of the doctrine of sovereign immunity is that the state may not be sued without its consent. [Citation.]" (*People v. Superior Court* (1947) 29 Cal.2d 754, 757.) In California, "[s]uits may be brought against the State in such manner and in such courts as shall be directed by law." (Cal. Const., art. III, § 5.) For example, California has waived its sovereign immunity for tort actions, provided there is compliance with a claims act. (See Gov. Code §§ 810 et seq. [Government Claims Act], 945 ["A public entity may sue and be sued"].)

The states' immunity from suit is sometimes referred to as "Eleventh Amendment immunity." "The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . ." (*Alden v. Maine* (1999) 527 U.S. 706, 713 [144 L.Ed.2d 636, 654] (*Alden*).)

An important limit on the sovereign immunity principle was established in *Ex parte Young* (1908) 209 U.S. 123 [52 L.Ed. 714] (*Young*). That case involved a challenge to a Minnesota law reducing the freight rates that railroads could charge. Railroad shareholders claimed that the new rates were unconstitutionally confiscatory, and obtained a federal injunction against Edward Young, the then Attorney General of Minnesota, forbidding him in his official capacity to enforce the state law. (*Id.* at pp. 127-129.) When Young violated the injunction, the Circuit Court held him in contempt and committed him to federal custody. (*Id.* at p. 126.) In his habeas corpus application in the United States Supreme Court, Young challenged his confinement by arguing that Minnesota's sovereign immunity deprived the federal court of jurisdiction to enjoin him from performing his official duties. (*Id.* at p. 134.)

10

The high court disagreed.  It explained that because an unconstitutional legislative enactment is "void," a state official who enforces that law "comes into conflict with the superior authority of [the] Constitution," and therefore is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States."  (*Young, supra,* 209 U.S. at pp. 159-160.)

In *Edelman v. Jordan* (1974) 415 U.S. 651, 664 [39 L.Ed.2d 662, 673] (*Edelman*), the high court limited the relief available under *Young* to prospective relief only.  In reversing an award of retroactive benefits under a federal-state program of Aid to the Aged, Blind, or Disabled, the court distinguished *Young.*  "The funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely the monetary award against the State itself, [citation], than it does the prospective injunctive relief awarded in [*Young*]."  (*Edelman, supra*, at p. 665.)  "In sum, *Edelman*'s distinction between prospective and retroactive relief fulfills the underlying purpose of . . . *Young* while at the same time preserving to an important degree the constitutional immunity of the States."  (*Pennhurst State School & Hosp. v. Halderman* (1984) 465 U.S. 89, 106 [79 L.Ed.2d 67, 82] (*Pennhurst II*).)

The Department relies on *Edelman* and *Pennhurst II* in arguing that sovereign immunity bars the recovery of retroactive benefits here.  But those cases, like *Young*, involve the state's immunity from suit in federal court.  Here, we are concerned with immunity in state court.  "The fact that a claim against a state or its agency cannot be brought in federal court due to the Eleventh Amendment does not, of course, necessarily mean the claim cannot be asserted in state court either."  (*Kirchmann v. Lake Elsinore Unified School Dist*. (2000) 83 Cal.App.4th 1098, 1103.)  Federal cases are not controlling on the question before us because "the immunity of a sovereign in its own

11

courts has always been understood to be within the sole control of the sovereign itself." (*Alden, supra,* 527 U.S. at p. 749.)

The Department contends this passage from *Alden* "merely clarifies that the State maintains sole control over any *waiver* of its sovereign immunity, not that this immunity is not protected by the United States Constitution." (Original italics.) The issue here, however, is waiver of sovereign immunity, that is, whether California recognizes an exception to sovereign immunity in a case such that before us.

California recognizes an exception to sovereign immunity for a mandamus proceeding. "The rule is well established in this state that where the action is one simply to compel an officer to perform a duty expressly enjoined upon him by law, it may not be considered a suit against the state. [Citations.]" (*County of Los Angeles v. Riley* (1942) 20 Cal.2d 652, 662 [mandamus appropriate to force state to recalculate credit for aid payments].) As examples of this rule, *Riley* cited to cases issuing a writ of mandate to compel the payment of sums required by law. (*Board of Directors v. Nye* (1908) 8 Cal.App. 527, 528-529 [balance of funds for the support and maintenance of the Woman's Relief Corps Home Association]; *Kingsbury v. Nye* (1908) 9 Cal.App. 574 [increased salary of state officer provided for in the amendment to the constitution]; *U'Ren v. State Board of Control* (1916) 31 Cal.App. 6, 7 [payment of state employee's salary for one month].)

This court addressed a situation very similar to that presented here in *County of Sacramento v. Lackner* (1979) 97 Cal.App.3d 576 (*Lackner*). There, to control escalating Medi-Cal costs, the then Director of the State Department of Health Care Services declared a fiscal emergency and imposed a 10 percent cutback in payments to health care providers and adopted a regulation causing postponement of certain elective services under Medi-Cal. (*Id.* at p. 581.) Several counties sued to enjoin the emergency regulations and the trial court found both the cutback and the regulations invalid. (*Id.* at p. 582.) The counties then sought declaratory relief and a peremptory writ of mandate.

12

The trial court found certain Medi-Cal payments insufficient and directed reimbursement. (*Id*. at p. 580.)

On appeal, defendants argued the trial court was without power to award any damages because plaintiffs failed to comply with statutory claims procedures, a necessary prerequisite to an action for money or damages against the state. (*Lackner, supra*, at pp. 586-587.) We rejected the argument. "An action in traditional mandamus, which seeks an order compelling an official to perform a mandatory duty, is not an action against the state for money, even though the result compels the public official to release money wrongfully detained. [Citations.]" (*Id.* at p. 587.) We explained: "[I]n the case before us plaintiffs sought to compel the state to disburse funds in the manner provided by the Medi-Cal statutes. While the action has the practical effect of awarding plaintiffs money (which has routinely been referred to as 'damages' by all parties), in law it is simply an action in mandamus to compel by ministerial act the release of funds, not one for damages from the sovereign." (*Id*. at p. 588.)

The Department reads *Lackner* to permit a writ of mandate to order the release of funds only if the funds have been "specifically appropriated" by the Legislature for the purpose in question. Here, as in *Lackner*, the funds in question are Medi-Cal payments. The language of "specific appropriation" that the Department quotes comes not from *Lackner*, but from a case cited by *Lackner*, *County of L.A. v. State Dept. Pub. Health* (1958) 158 Cal.App.2d 425. There, the appellate court found "the object of the present suits is to compel state officers to disburse funds specifically appropriated for tuberculosis subsidies in the manner provided by the statute. This involves no invasion of state sovereignty and does not fall within the rule precluding suits against the state without its consent." (*Id*. at p. 443.)

*Lackner* did not limit its own holding to "specifically appropriated" funds. While the judgment was limited to funds already appropriated, that limitation was due to a statute limiting the extent of the state's liability to a maximum of the amount

13

appropriated by the state in a fiscal year for the purpose in question. We remanded for a recalculation of damages as limited by this statute. (*Lackner, supra*, 97 Cal.App.3d at pp. 590, 592.)

We recognize one difference between this case and *Lackner.* In *Lackner*, the Medi-Cal funds had been appropriated by the Legislature and it was the Department of Health Care Services' director who imposed the cutback. Here, the Legislature excluded certain services by enacting section 14131.10, and presumably reduced the Medi-Cal apportionment. That legislative action, however, was invalid as it conflicted with federal law, as *CARHC* held. As discussed *ante,* by agreeing to *participate* in Medicaid, California agreed to comply with Medicaid's requirements. Thus, coverage for the disputed services was *at all times* required by both federal and state law, giving rise to the Department's mandatory duty to process claims and pay from appropriated Medi-Cal funds those that were valid.[2] As to compelling performance of a mandatory duty by a writ of mandate, this case is the same as *Lackner*.

We read *Lackner* to permit a petition for a writ of mandate to proceed without compliance with a claims statute and not subject to the bar of sovereign immunity when it seeks to compel compliance with a mandatory duty, even if that duty requires the release of funds as required by law.

"Courts have frequently found mandamus to be available in cases similar to the one at bar, where one public entity seeks to force another to release funds in accordance with a statutory duty." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 868

---

[2] The Department's position would permit the state to avoid fulfilling its Medicaid obligations in tough economic times without recourse by passing questionable legislation denying benefits while well-taken challenges to the legislation wind their way through the courts. "[W]hile courts are cognizant of the need for fiscal economy, ' "budgetary constraints cannot excuse a failure to comply with federal standards." ' " (*Jeneski v. Myers* (1984) 163 Cal.App.3d 18, 24.)

14

[citing *Lackner* with approval] (*City of Dinuba*).)  In *City of Dinuba,* our Supreme Court rejected a governmental immunity defense to a suit to recover misallocated tax revenue, finding mandamus was an appropriate remedy.  "It is undisputed that defendants had a duty to correctly calculate and distribute the tax revenue.  Nor can it be disputed that plaintiffs had a beneficial right in defendants doing so.  It follows then that mandamus provides an appropriate remedy for defendants' failure to comply with their statutory duty."  (*City of Dinuba, supra,* at p. 868; see also *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1125-1126 [writ of mandate to direct return to quarterly payments to retirement system and transfer of funds due under that schedule].)

The Department cites to cases where claims for retroactive reimbursement were denied.  Those cases, however, turned on the lack of a duty to release the funds rather than the retrospective nature of the claims.  The issue was entitlement rather than timing.  For example, in *Madera Community Hospital v. County of Madera* (1984) 155 Cal.App.3d 136 (*Madera*), a hospital filed a petition for a writ of mandate to compel the county to adopt standards for medical care for the poor which standards would require reimbursement to the hospital.  The appellate court directed the trial court to issue a writ of mandate compelling the county's board of supervisors to adopt such standards.  (*Id.* at p. 152.)  The court held, however, that the hospital's failure to file a proper claim precluded reimbursement, distinguishing *Lackner* because *Lackner* involved the performance of a ministerial duty and "in this case Hospital has failed to show any entitlement to reimbursement because of the absence of standards adopted by County which would authorize such payment."  (*Madera*, *supra*, at p. 149; see also *Santa Ana Hospital Medical Center v. Belshé* (1997) 56 Cal.App.4th 819, 837 [distinguishing *Lackner* because "there is no duty to disburse the funds claimed by appellant; to the contrary, the statute prevents disbursement"].)

The Department contends that styling the lawsuit as a petition for writ of mandate is not dispositive because sovereign immunity and the need to comply with the

15

Government Claims Act as an exception "applies to all forms of monetary demands, regardless of the theory of the action. [Citation.] This includes a mandamus action seeking monetary reimbursement." (*Sparks v. Kern County Bd. of Supervisors* (2009) 173 Cal.App.4th 794, 798 (*Sparks*).) The Department contends this case is no different than *Sparks*; both sought monetary reimbursement.

In *Sparks,* a sheriff who had successfully defended himself in a lawsuit after the county denied his request for a defense, petitioned for a writ of mandate seeking reimbursement of the attorney fees and costs he incurred. The trial court denied the petition because Sparks had not complied with the Government Claims Act. (*Sparks, supra,* 173 Cal.App.4th at pp. 796-797.) The appellate court affirmed, rejecting the argument that Sparks sought declaratory or injunctive relief and the monetary relief was merely incidental. The court noted Sparks did not seek to compel the county to perform its duty of providing a defense; he sought only reimbursement of his defense costs. (*Id.* at p. 799.)

Here, the Clinics did not directly seek money at all. Rather, they sought the creation of an orderly process for the processing and payment of qualified claims for certain services they provided between July 1, 2009, and September 26, 2013. The Clinics sought a *process* that *could* lead to a monetary recovery; they did not bring an action for money or damages. Although the judgment ordered the Department "to process *and pay* for adult dental, chiropractic, and podiatric services" provided by FQHC's and RHC's between July 1, 2009, and September 26, 2013, the judgment expressly referenced the court's order, "As set forth in the Order After Hearing." The trial court's order shows the proceeding was to enforce a mandatory duty. The court awarded no damages. Instead, it ordered the Department to do its duty with respect to Medi-Cal claims from RHC's and FQHC's and follow existing regulations for the processing of late claims. The Department had to pay something, if at all, only after it exercised its discretion as to whether to accept late claims and determined whether any

16

accepted claims were payable. The trial court explicitly noted it was not clear at the time of its ruling that the Clinics were entitled to *any* money.

The trial court did not err in finding the Clinics' petition for a writ of mandate was not barred by sovereign immunity.

## II

### *Retroactivity of the CARHC Decision*

A. *General Rule of Retroactivity*

The Department contends it has no mandatory duty to pay claims for adult dental, podiatric, and chiropractic services rendered between July 1, 2009, and September 26, 2013, because the *CARHC* decision did not find any such duty for that time period. The Department asserts it had no duty to pay claims during the contested period because the *CARHC* decision, that found the duty to pay such claims, is not retroactive.

"The general rule that judicial decisions are given retroactive effect is basic in our legal tradition." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978.) "Whenever a decision undertakes to vindicate the original meaning of an enactment, putting into effect the policy intended from its inception, retroactive application is essential to accomplish that aim. [Citation.]" (*People v. Garcia* (1984) 36 Cal.3d 539, 549, overruled on another point in *People v. Lee* (1987) 43 Cal.3d 666, 676.) The *CARHC* decision merely *interpreted* federal law on the question of whether Medicaid required coverage for adult dental, podiatric, and chiropractic services provided by RHC's and FQHC's. It did not declare a new rule of law; it interpreted existing law that had not yet been interpreted. Where, as here, there is no material change in the law, the question of retroactivity does not apply. (*Woosley v. State of California* (1992) 3 Cal.4th 758, 794.)

In the trial court, the Department argued *CARHC* was not retroactive because it changed "a settled rule on which the parties below have relied." The trial court properly rejected this argument. Although the Department claimed it relied on section 14131.10,

17

that statute was not yet "settled law." The validity of section 14131.10 was challenged in federal court soon after its enactment. Where, as here, "the decision represents the first authoritative construction of the enactment, no history of extended and justified reliance upon a contrary interpretation will arise to argue against retroactivity." (*People v. Garcia*, *supra*, 36 Cal.3d at p. 549.)

B. *New Issue on Appeal*

On appeal, the Department raises a new argument as to why in its view *CARHC* cannot be retroactive. Congress passed the Medicaid Act pursuant to the spending power of article I, section 8, clause 1 of the United States Constitution. (*Mission Hospital Regional Medical Center v. Shewry* (2008) 168 Cal.App.4th 460, 469.) The Department argues that such legislation is in the nature of a contract and any conditions imposed on the states receiving Medicaid money must be clear and unambiguous. It asserts that it was not clear from the legislation that adult dental, podiatric, and chiropractic services provided by RHC's and FQHC's were mandatory benefits and therefore mandatory coverage for those benefits cannot be imposed retroactively.

The Department did not raise this contention in the trial court and offers no reason for its failure to do so. The Clinics assert the Department has forfeited this contention by failing to raise it below. They argue this issue is not properly before us and should not be entertained.

" 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal . . . .' [Citation.] 'New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal.' [Citation.] ' "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. . . . Bait and switch on appeal not only subjects

18

the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." ' [Citation.]" (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.) "In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack. [Citation.]" (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.) The Department failed to fulfill this obligation.

The rule against raising new issues on appeal, however, is not absolute. "As an exception to the general rule, the appellate court has discretion to consider issues raised for the first time on appeal where the relevant facts are undisputed and could not have been altered by the presentation of additional evidence. [Citations.]" (*Duran v. Obesity Research Institute, LLC* (2016) 1 Cal.App.5th 635, 646.) "Moreover, appellate courts are most likely to consider an issue involving undisputed facts for the first time on appeal where the issue involves important questions of public policy or public concern. [Citation.]" (*Ibid.*)

We do not condone the practice of asserting new theories on appeal when they could have been raised in the trial court. Here, the effect is to give the Department an undeserved second bite at the apple after its first attempt proved unsuccessful. Nonetheless, because the Department's contention raises a pure issue of law and because it involves a matter of public interest and the public fisc, we exercise our discretion to consider the issue.

C. *Legislation Pursuant to Spending Clause*

"Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. [Citations.] . . . [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power

19

to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' [Citations.] There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. [Citations.] By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." (*Pennhurst State School & Hosp. v. Halderman* (1981) 451 U.S. 1, 17 [67 L.Ed.2d 694, 707] (*Pennhurst I*).) "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or 'retroactive' conditions." (*Id.* at p. 25.)

The Department argues the statutory scheme governing which services provided by RHC's and FQHC's are mandatory under Medicaid is complex and did not provide adequate notice that coverage for the services in question is mandatory. The Department contends it reasonably concluded that mandatory physicians' services included only services of doctors of medicine and osteopathy, the definition of physician in the Medicaid Act, not the services of the broader definition of physician in the Medicare Act. In support of this argument, the Department notes its interpretation was accepted by CMS in approving the Department's SPA's and by the district court.

We reject this argument. First, the Legislature acknowledged there were federal limitations on its power to exclude benefits. "This section shall only be implemented to the extent permitted by federal law." (§ 14131.10, subd. (d).)

Second, in *CARHC*, the Ninth Circuit found the statutory language at issue was clear and unambiguous. (*CARHC, supra,* 738 F.3d at pp. 1014, 1016.) The Department claims the Ninth Circuit made this finding only in the context of whether *Chevron* deference applied and "that is a very different question from whether these requirements were sufficiently clear" for spending clause purposes. The Department does not explain

20

why and in what manner the determination of clear and unambiguous language differs between the two contexts, and we do not discern a compelling difference. In both instances, the issue is whether the language was "clear and unambiguous." In the *Chevron* deference context, the answer determines whether deference is given to the agency's determination. Here, the Department is also relying on the agency's determination, CMS approving its SPA's, to show the language was ambiguous. Moreover, the Ninth Circuit's finding that the statutory scheme was clear and unambiguous was not limited to its discussion of *Chevron* deference; the court used the same terms to describe the statutory language generally in its discussion of statutory interpretation. (*CARHC, supra,* at p. 1016.)

Third, the Department's claim of surprise (that *CARHC* found that the Medicare definition of physician applied to RHC and FQHC services) is not well taken. The Department relies on the approval of the SPA's to assert that the Secretary of the United States Department of Health and Human Services shared its interpretation.[3] In *Pennhurst I, supra,* 451 U.S. 1, the high court considered whether the statutory language was sufficiently clear to impose the obligations of section 6010 of title 42 of the United States Code on states participating in the federal-state grant program providing financial assistance to participating states to aid them in creating programs to care for and treat the developmentally disabled. The court found it "strains credulity to argue that participating States should have known of their 'obligations' under § 6010 when the Secretary of HHS, the governmental agency responsible for the administration of the [Developmental Disablities Assistance and Bill of Rights] Act and the agency with which the participating

---

[3] The Department cannot claim its own reliance on the approval of the SPA's because it denied claims on the authority of section 14131.10 before it obtained the approval from the United States Department of Health and Human Services. (*CARHC, supra,* 738 F.3d at p. 1011.)

21

States have the most contact, has never understood § 6010 to impose conditions on participating States." (*Pennhurst I, supra,* at p. 25.) We find *Pennhurst I* distinguishable because there the agency's understanding of the meaning of the law was not based on the approval of an SPA, but on regulations that the agency had adopted. (*Id.* at p. 23.) The adoption of regulations indicates a more thorough consideration and acceptance of a position than merely approving a SPA.[4] Further, the *Pennhurst I* court, unlike the *CARHC* court, found the statutory language ambiguous. (*Pennhurst I, supra,* at p. 19.)

In support of its argument, the Department has requested judicial notice of the two approved SPA's as official acts and matters not subject to dispute. (Evid. Code, § 452, subds. (c) & (h).) The Clinics object only on the basis that this material was not before the trial court. Because we have exercised our discretion to consider this new issue on appeal, we grant the request for judicial notice of this material.

This material, however, does not assist the Department's argument of surprise. The first SPA limits coverage for services deemed optional. To this effect it states that "[a]cupuncture, audiology, chiropractic, podiatry, dental, speech therapy, are covered optional benefits only for" very limited categories of beneficiaries. But both SPA's set forth the definition of "physician" for purposes of RHC's and FQHC's. They use the Medicare definition which includes podiatrists, optometrists, chiropractors, and dentists. It was this definition of physician for RHC's and FQHC's that served as the basis for the *CARHC* decision. The Department cannot claim surprise at the Ninth Circuit's adoption of the Medicare definition when the same definition was included in its SPA's.

---

**4** In the district court, plaintiffs offered evidence that CMS took the position that " 'the definition of FQHC services is the same for Medicaid as it is for the Medicare program.' " (*Maxwell-Jolly, supra,* 748 F.Supp.2d at p. 1197.) To the extent the Department claims CMS now advances a different interpretation, the inconsistency in interpretations counsels against granting great weight to any interpretation by CMS.

22

III

*Separation of Powers*

The Department raises a second new issue that it did not raise in the trial court, that the judgment violates the separation of powers doctrine because it requires the Legislature to appropriate funds to reimburse RHC's and FQHC's. "A court has no authority to issue a writ of mandate that interferes with powers exclusively committed to the other branches of government. [Citation.] The enactment of a budget bill is fundamentally a legislative act, entrusted to the Legislature and the Governor and not the judiciary. [Citations.] The California Constitution's separation of powers doctrine forbids the judiciary from issuing writs that direct the Legislature to take specific action, including to appropriate funds and pass legislation. [Citations.] [¶] Under these principles, a court is prohibited from using its writ power to require an appropriation even if the Legislature is statutorily required to appropriate certain funds. [Citations.]" (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 799.)

The Clinics contend the Department is barred from raising this new issue on appeal because it involves factual questions about appropriations. In support of their position, the Clinics request judicial notice of portions of the Budget Act of 2016. The Department has not objected to this request and we grant it. The 2016 Budget Act appropriates $17 billion to the Department for local assistance.

There is no violation of the separation of powers when " 'a court orders appropriate expenditures from already existing funds. [Citations.] The test is whether such funds are "reasonably available for the expenditures in question . . . ." [Citations.] Funds are "reasonably available" for reimbursement when the purposes for which those funds were appropriated are "generally related to the nature of costs incurred . . . ." [Citation.]' " (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 598.) The reasonable availability of funds to pay any successful claims by RHC's and

FQHC's for the disputed services poses factual questions that cannot be answered on this record.

In its reply brief, the Department focuses its separation of powers argument on its claim that the *CARHC* decision and the Department's duty to process and pay valid claims are not retroactive, an argument we have rejected. It further argues any factual issues as to the sufficiency of funds is premature and will only arise if and when proper claims are filed. The Department contends those appropriation issues are not raised in this appeal. We find this argument confusing as it suggests the separation of powers argument raised in the opening brief (claiming a need for a new appropriation) is premature. The Department appears to concede that the availability of funds and the need for additional appropriations are factual questions. Accordingly, we decline to consider this new issue based on separation of powers. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847.)

## DISPOSITION

The judgment is affirmed. The Clinics shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


     DUARTE     , J.


We concur:


     RAYE     , P. J.


     HULL     , J.