Filed 10/5/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| OROVILLE DAM CASES | C093600 |
| | (Super. Ct. No. JCCP4974) |

APPEAL from a judgment of the Superior Court of Sacramento County, James E. McFetridge, Judge.  Affirmed.

Porter Scott, Chad S. Tapp, Thomas L. Riordan, and Michael L. Ramsey for Plaintiff and Appellant.

Rob Bonta, Attorney General, Jeff Vincent, Senior Assistant Attorney General, Bruce D. McGagin and Scott H. Cavanaugh, Deputy Attorneys General, for Defendant and Respondent.

This case arises out of the Department of Water Resources's (DWR) release of water from Lake Oroville down the Oroville Dam's gated flood control spillway and emergency spillway in February 2017.  The Butte County District Attorney brought this

1

action under Fish and Game Code section 5650.1[1] on behalf of the People seeking civil penalties and injunctive relief against DWR.[2] The statute authorizes civil penalties against any "person" who has deposited harmful materials into the waters of this state. The statute also authorizes injunctive relief. The trial court granted summary judgment for DWR on the basis that it had demonstrated the complaint failed to state a cause of action. In particular, the trial court held DWR is not a "person" under section 5650.1.

On appeal, the People contend the trial court erred in granting DWR's motion because DWR is a "person" under section 5650.1. Alternatively, the People argue that, even if DWR is not a "person" under this provision, DWR did not negate the People's cause of action with respect to injunctive relief. We disagree and affirm the judgment.

## I. BACKGROUND

In February 2018, the Butte County District Attorney filed a "Complaint for Civil Penalties" against DWR.[3]

The complaint alleges DWR is responsible for the operation, maintenance, and regulation of the Oroville Dam, including the gated flood control spillway and the emergency spillway. Further, DWR has used, operated, and maintained the Oroville Dam since its construction began in 1961.

The complaint alleges a single cause of action for a violation of section 5650. This statute states, in relevant part, that "it is unlawful to deposit in, permit to pass into,

---

[1] Undesignated statutory references are to the Fish and Game Code.

[2] This action and others were coordinated under Judicial Council order (Code Civ. Proc., § 404.3; Cal. Rules of Court, rule 3.540) in the Sacramento County Superior Court as the Oroville Dam Cases (JCCP No. 4974).

[3] "Every civil action brought under this section shall be brought by the Attorney General, district attorney, or city attorney in the name of the people of the State of California . . . ." (§ 5650.1, subd. (d)(1).)

or place where it can pass into the waters of this state any of the following: [¶] . . . [¶] (6) Any substance or material deleterious to fish, plant life, mammals, or bird life." The complaint alleges that between February 7 and February 27, 2017, DWR "released water from Lake Oroville down the Oroville Dam's gated flood control spillway causing a large area of the concrete spillway and nearby hillside to erode thereby depositing in and placing where it could pass into the waters of the State of California, to wit: the Feather River, concrete, lime, slag and substances and material deleterious to fish, plant life, mammals and bird life." The complaint makes similar allegations with respect to the emergency spillway: "From February 11, 2017 to February 12, 2017, [DWR] permitted water to pass over the Oroville Dam's emergency spillway causing the hillside beneath the emergency spillway to erode thereby depositing in and placing where it could pass into . . . the Feather River, concrete, lime, slag and substances and material deleterious to fish, plant life, mammals and bird life."

The complaint alleges DWR's release of water down the gated flood control spillway and emergency spillway caused an estimated 1,700,000 cubic yards of material deleterious to fish, plant life, mammals, and bird life to pass into the Feather River. The complaint alleges this debris included concrete and soil, and weighed between 3,400,000,000 and 5,100,000,000 pounds. The complaint seeks civil penalties under section 5650.1. Additionally, the prayer for relief asks for a permanent injunction requiring DWR to comply with section 5650 et seq.

In September 2020, DWR moved for summary judgment on four grounds: (1) DWR is not a "person" under section 5650.1 such that it could be liable for civil penalties; (2) sovereign immunity bars application of sections 5650 and 5650.1 against DWR; (3) injunctive relief is inappropriate and unwarranted as a matter of law; and (4) the People's claims for compensatory damages and restitution are inadequately pled and cannot be amended because the People failed to satisfy the claim presentation requirements of the Government Claims Act (Gov. Code, § 810 et seq.).

3

In response, the People argued: (1) DWR is a "person" under section 5650.1; (2) public policy supports the assessment of civil penalties against DWR; (3) civil penalties do not implicate constitutional separation of powers principles; and (4) sovereign immunity has no application. The People offered no response to DWR's assertion that injunctive relief was inappropriate and unwarranted. The People also did not dispute any of DWR's asserted facts. Those facts were as follows:

The "Oroville facilities," also known as Federal Energy Regulatory Commission (FERC) Project No. 2100, are located on the Feather River in Butte County. The principal features of the Oroville facilities include the Oroville Dam, the gated main and ungated emergency spillways, the reservoir, the Thermalito facilities, the Feather River fish hatchery, and associated recreational, fish, and wildlife preservation and enhancement facilities. In 1957, FERC issued DWR a 50-year license to construct and operate the Oroville facilities. In 1964, FERC issued an amended license that includes the following term:

"Article 46. The Licensee shall prevent damage to fish and wildlife resulting from construction or operation of the project. Special precautions shall be taken to: (a) prevent discharge of silt, petroleum products, and other harmful substances or debris into the Feather River, (b) prevent loss, removal, disturbance, and compaction or shifting of gravel of the Feather River channel downstream from Thermalito diversion dam except as may be appropriate for protection or the improvement of fish habitat, and (c) prevent the project borrow areas from becoming sources of silt or other fines during floods or serving to dissipate stream maintenance flows or serving to trap anadromous fish."

The original license expired on January 31, 2007. FERC authorized continued operations on February 1, 2007. The Oroville facilities currently operate under the February 1, 2007 annual license that automatically renews each year until a new license is issued. None of the extensions modified Article 46.

After the February 2017 emergency event, FERC issued a "Draft Environmental Assessment: Amendment of Project License to Reconstruct the Lake Oroville Main Spillway, Modify the Emergency Spillway, and to Relocate a Project Transmission Line." In this draft environmental assessment, FERC recommends DWR "prepare and file a Sedimentation and Erosion Assessment and Mitigation Plan," which should include "a broad assessment of effects to soil resources, riparian habitat, and the streambed in the lower Feather River." "If the analysis identifies any significantly degraded areas of mass soil wasting from flow reductions or identifies any areas of significant sediment deposition from the spillway failure," FERC advises DWR to "include details in its plan for directly or indirectly mitigating those effects" in consultation with state and federal fish and wildlife agencies. When DWR filed its motion for summary judgment, it was proactively addressing issues raised in the draft environmental assessment. DWR's staff had begun to comply with the draft environmental assessment by developing and submitting to FERC plans for rehabilitation including soil rehabilitation and additional site stabilization and planting. DWR was coordinating the restoration plan with the Department of Fish and Wildlife. DWR was also working on a biological opinion to address anadromous fish with the National Marine Fisheries Service.

The trial court asked for supplemental briefing regarding whether flood waters carrying debris or causing erosion could form the basis for a violation of section 5650. Ultimately, the trial court granted summary judgment without addressing its supplemental questions.[4] It explained that DWR's motion, in effect, asserts that the complaint does not state a cognizable claim.

---

[4] The trial court did not rule on DWR's request for judicial notice of the complaint and various legislative history documents. As such, DWR renewed the motion on appeal. We deferred decision pending calendaring and assignment of the panel. We now grant the unopposed request. (Evid. Code, § 452, subds. (c), (d).)

The trial court held DWR is not a "person" within the scope of section 5650.1. Therefore, the complaint failed to state a claim.

The trial court entered judgment in favor of DWR in January 2021, and the People filed a timely appeal.[5]

## II.  DISCUSSION

### A.  *Standard of Review*

A motion for summary judgment must be granted where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

The primary issue raised by the People in this appeal is whether DWR is a "person" within the scope of section 5650.1.  We review the trial court's ruling on summary judgment and the underlying statutory construction issue de novo.  (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531.)  As the trial court explained, "[a] motion for summary judgment necessarily tests the pleadings, and where there is a failure to state a cause of action, or . . . the action is barred on the face of the complaint, the motion is tantamount to a motion for judgment on the pleadings." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1276, fn. 25.)[6]  In granting DWR's motion, the trial court stated, "in form, the motion for summary judgment here is treated as a motion for judgment on the pleadings."  However, we are not limited by the trial court's reasoning.  "We determine whether the court's ruling was correct, not its reasons or rationale." (*Scheer v. Regents of the University of California* (2022) 76 Cal.App.5th

---

[5]  This case became fully briefed in May 2023.

[6]  The standard of review with respect to a motion for judgment on the pleadings is also de novo:  "An appeal from a judgment on the pleadings generally presents a predominantly legal issue, requiring the appellate court to determine, de novo and as a matter of law, whether the complaint states a cause of action." (*Quiroz v. Seventh Ave. Center, supra*, 140 Cal.App.4th at p. 1277.)

904, 913.)  Furthermore, because, for the first time on appeal, the People contest the entry of judgment based on their request for injunctive relief, and DWR submitted evidence related to this request, we will not treat the motion as one for judgment on the pleadings.

*B.*        *"Person"*

The parties dispute whether DWR is a "person" within the meaning of section 5650.1.  It provides:  "A person who violates Section 5650 is subject to a civil penalty of not more than twenty-five thousand dollars ($25,000) for each violation."  (§ 5650.1, subd. (a).)  Further, "a person who violates Section 5650 is subject to a civil penalty of not more than ten dollars ($10) for each gallon or pound of material discharged."  (*Id.*, subd. (i).)  The Fish and Game Code defines "person":  " 'Person' means any natural person or any partnership, corporation, limited liability company, trust, or other type of association."  (§ 67.)  As such, we will begin with the question of whether DWR is a "person" as defined by section 67.

"We apply well-settled principles of statutory construction.  Our task is to discern the Legislature's intent.  The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.  On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history . . . and maxims of statutory construction.  In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy."  (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 (*Wells*).)

In *Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969, 979 (*Watershed Enforcers*), another Court of Appeal explained "the literal textual meaning" of "person" as defined by section 67 "would seem to exclude state agencies."  Indeed, our court has previously explained "[t]he state is neither a

7

natural person, partnership, corporation, association, nor other 'organization [] of persons.' " (*Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1203 [concluding state agency is not a "person" under California's unfair competition law].)

"In other contexts, the Legislature has demonstrated that similar definitions of 'persons' do not include public entities, and that legislators know how to include such entities directly when they intend to do so." (*Wells, supra*, 39 Cal.4th at p. 1190 [California False Claims Act defined "person" to " 'include[] any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust' "].)  Other parts of the Fish and Game Code illustrate this point. Section 2080 states:  "No person *or public agency*" may import, export, possess, purchase, or sell within California an endangered or threatened species.  (Italics added.) Section 1615, subdivision (a), also expressly applies to government agencies:  "An *entity* that violates this chapter is subject to a civil penalty of not more than twenty-five thousand dollars ($25,000) for each violation."  (Italics added.; see § 1601, subd. (d) [" 'Entity' means any person, *state or local governmental agency*, or public utility that is subject to this chapter," italics added].)  Section 711.2, subdivision (b) provides:  "For purposes of this article, 'person' includes any individual, firm, association, organization, partnership, business, trust, corporation, limited liability company, company, district, city, county, city and county, town, the state, *and any of the agencies of those entities*." (Italics added.)  The fact the Legislature did not expressly include public agencies in sections 67 or 5650.1 demonstrates it did not intend these provisions to apply to state agencies such as DWR.[7]  (See *Wells, supra*, at p. 1190 ["The specific enumeration of state and local governmental entities in one context, but not in the other, weighs heavily

---

[7]  This case does not address whether any local public entities are a "person" under section 5650.1.

8

against a conclusion that the Legislature intended to include public school districts as 'persons' exposed to [California False Claims Act] liability"].)

*Watershed Enforcers* interpreted section 2080 prior to the addition of the "or public agency" language. It held that a "person" under section 2080 included DWR, not because of section 67 but because of a proviso in section 2 and the context and policies of the statutory scheme at issue. (*Watershed Enforcers, supra,* 185 Cal.App.4th at pp. 980, 983.) Section 2 states: "*Unless the provisions or the context otherwise requires*, the definitions in this chapter govern the construction of this code . . . ." (Italics added.) In *Watershed Enforcers*, the statutory context required a different result than the plain language of section 67 indicated. As the court explained, other statutory language emphasized the California Endangered Species Act (§ 2050 et seq.) applied to public agencies. (*Watershed Enforcers, supra,* at p. 980.) For instance, section 2081 allows the Department of Fish and Game to "authorize acts that are otherwise prohibited pursuant to Section 2080, as follows: [¶] (a) Through permits or memorandums of understanding, the department may authorize individuals, *public agencies*, . . . and scientific or educational institutions, to import, export, take, or possess any endangered species, threatened species, or candidate species for scientific, educational, or management purposes." (§ 2081, italics added.) The court stated, "It is illogical to expressly exempt an entity from a prohibition that did not apply to it in the first place. Therefore, section 2080 must apply to public entities or the exemption for public agencies in section 2081 is rendered surplusage—a result we must generally avoid." (*Watershed Enforcers, supra*, at p. 980.) The court held that "given the context and policies of [the California Endangered Species Act], including the policy of species preservation made expressly applicable to state agencies, as well as the statutory language expressly referring to state agencies, . . . a state agency is a 'person' within the meaning of section 2080." (*Id*. at p. 983.) No similar references to state agencies or public agencies make clear that section 5650.1 applies to DWR. Thus, *Watershed Enforcers* is distinguishable because the

9

context and provisions of section 5650.1 do not suggest we should disregard the plain meaning of "person" set forth in section 67.

The People argue exempting DWR from section 5650.1 is bad policy. The People rely on the fact that the appellate court in *Watershed Enforcers* "note[d] the general rule that ' "[l]aws providing for the conservation of natural resources" such as . . . [California Endangered Species Act] "are of great remedial and public importance and thus should be construed liberally." ' " (*Watershed Enforcers, supra*, 185 Cal.App.4th at p. 979.) "We cannot, however, rewrite a statute under the guise of a liberal interpretation." (*Berry v. American Express Publishing, Inc*. (2007) 147 Cal.App.4th 224, 232.) *Watershed* also noted "the 'well-settled rule of statutory construction that absent express language to the contrary, governmental entities are excluded from the operation of general statutory provisions which implicate the exercise of sovereign powers' " and explained "express statutory language supports the application of section 2080 to state agencies." (*Watershed Enforcers, supra*, at p. 988.) " 'The general expression of the doctrine of sovereign immunity is that the state may not be sued without its consent.' " (*American Indian Health & Services Corporation v. Kent* (2018) 24 Cal.App.5th 772, 782.) We cannot find such consent conferred solely for policy reasons.

We also reject the People's assertion that our construction of the statute is absurd. "We must, of course, interpret statutes to avoid anomalous or absurd results that the Legislature could not have intended and that would frustrate the Legislature's intent. [Citations.] But '[w]e must exercise caution using the "absurd result" rule; otherwise, the judiciary risks acting as a " 'super-Legislature' " by rewriting statutes to find an unexpressed legislative intent.' " (*PGA West Residential Assn., Inc. v. Hulven Internat., Inc*. (2017) 14 Cal.App.5th 156, 187.) It is not absurd that the Legislature exempted state agencies from civil penalties under section 5650.1 even if they are not exempted from liability under every similar statute.

10

Having concluded the People could not state a claim for civil penalties against DWR under section 5650.1, we now turn to the question of whether it was error to grant DWR's motion for summary judgment as to the People's entire complaint.

## C. Injunctive Relief

The People contend that even if DWR is not a "person" under section 5650.1, the trial court erred in granting summary judgment because DWR did not negate the People's cause of action under section 5650.1 regarding injunctive relief. DWR argues the People have waived this argument by not raising it in the trial court. We disagree. "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) If the moving party meets its initial burden, then the burden shifts to the opposing party to demonstrate the existence of a triable issue of material fact. (*Ibid.*) Consequently, an opposing party "cannot be said to have waived" an argument that the moving party did not meet its initial burden of production by not raising it in the trial court. (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 367.) Nonetheless, as we will explain next, the People's argument is without merit.

The People's argument is based on the fact that, unlike the subdivisions regarding civil penalties, the subdivisions of section 5650.1 mentioning injunctive relief do not refer to a "person" as the proper defendant.[8] Even assuming this distinction means the

---

[8] "(e) In a civil action brought pursuant to this chapter in which a temporary restraining order, preliminary injunction, or permanent injunction is sought, it is not necessary to allege or prove at any stage of the proceeding that irreparable damage will occur if the temporary restraining order, preliminary injunction, or permanent injunction is not issued, or that the remedy at law is inadequate.

"(f) After the party seeking the injunction has met its burden of proof, the court shall determine whether to issue a temporary restraining order, preliminary injunction, or

11

State consented to suits for injunctive relief arising out of violations of section 5650, the People's argument is unavailing because, in its motion for summary judgment, DWR argued the People's request for injunctive relief failed as a matter of law because it was unwarranted and would serve no purpose. DWR demonstrated the request for injunctive relief failed on this basis alone.

"An injunction properly issues only where the right to be protected is clear, injury is impending and so immediately likely as only to be avoided by issuance of the injunction. [Citation.] A corollary of this rule is that a change in circumstances which renders injunctive relief unnecessary justifies denial of the remedy. [Citation.] An injunction should not issue as a remedy for past acts which are not likely to recur." (*East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1126.) Additionally, "we must presume that the agency will obey and follow the law." (*Id.* at p. 1132.) In its moving papers, DWR argued the complaint identified no ongoing conduct the People sought to enjoin but appeared to impermissibly request that DWR "obey the law." The People did not respond to this argument in the trial court. On appeal, the People's opening brief asserts they "alleged many violations of section 5650 by DWR *in the immediate aftermath of the February 2017 flooding event*, and simply sought to ensure that DWR did not continue to commit such violations in the

---

permanent injunction without requiring the defendant to prove that it will suffer grave or irreparable harm. The court shall make the determination whether to issue a temporary restraining order, preliminary injunction, or permanent injunction by taking into consideration, among other things, the nature, circumstance, extent, and gravity of the violation, the quantity and characteristics of the substance or material involved, the extent of environmental harm caused by the violation, measures taken by the defendant to remedy the violation, the relative likelihood that the material or substance involved may pass into waters of the state, and the harm likely to be caused to the defendant.

"(g) The court, to the maximum extent possible, shall tailor a temporary restraining order, preliminary injunction, or permanent injunction narrowly to address the violation in a manner that will otherwise allow the defendant to continue business operations in a lawful manner." (§ 5650.1, subds. (e)-(g).)

future when making discharges from Oroville Dam." (Italics added.) This argument essentially proves DWR's point.

"We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc*. (2001) 26 Cal.4th 465, 476.) Doing so, we conclude DWR met its burden as the moving party to show that injunctive relief was unwarranted, and the People failed to rebut this showing. The complaint does not allege any ongoing conduct but rather is based on release of water down a gated flood control spillway and an emergency spillway in an emergency in February 2017. In concluding that the People had not created a triable issue of fact, the trial court explained: "The facts here are undisputed that the context was a declared emergency from flooding, because of heavy rainfall. DWR had to manage and control, in an emergency, excessive storm waters that threatened the dam. DWR had been accorded the authority to control releases of the water to protect the dam and to reduce downstream damage from floods. That is all that DWR did."[9] It was also undisputed that DWR was proactively addressing issues raised in the draft environmental assessment. The trial court did not err in granting DWR's motion.

---

[9] In an emergency, DWR may "[l]ower the water level by releasing water from the reservoir," "[c]ompletely empty the reservoir," or "[t]ake such other steps as may be essential to safeguard life and property." (Wat. Code, § 6111.)

## III.  DISPOSITION

The judgment is affirmed.  The Department of Water Resources shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

_____

RENNER, J.

We concur:

/S/

_____

EARL, P. J.

/S/

_____

BOULWARE EURIE, J.